720 A.2d 994 (1998)
316 N.J. Super. 580
Victor DAIBO, Plaintiff-Respondent,
v.
Ned KIRSCH and Melvin Kirsch, Defendants-Appellants, and
B.G. a/k/a Robert Gray and A.Z. a/k/a Abraham Zuckerman, John Does 1 and 3, Jointly and Severally, and Inmar Associates, Inc., a New Jersey Corporation, and Linn Associates, a New Jersey General Partnership, Michael and Alla Kirsch, Gregg and Jill Stone, Nancy Kesselman, and Robert Kirsch, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 15, 1998.
Decided December 17, 1998.
*995 Bruce H. Snyder, Roseland, for defendants-appellants (Lasser Hochman, attorneys; Mr. Snyder, of counsel and on the briefs).
Bart W. Lombardo, Cranford, for plaintiff-respondent (Frieri & Conroy, attorneys; Donna M. Conroy and Mr. Lombardo, on the brief).
Before Judges STERN, BRAITHWAITE and WECKER.
The opinion of the court was delivered by STERN, P.J.A.D.
Defendants appeal from a judgment for plaintiff in the amount of $225,500, comprising (1) $100,000 for "the total purchase price for all of plaintiff's right, title and interest in Inmar Associates[, Inc.]" (Inmar), (2) $100,000, "representing damages for equitable fraud," based on plaintiff's payment of an overvalued purchase price for his interest in Inmar, and (3) prejudgment interest on the equitable fraud award. All claims by plaintiff for "legal fraud" were "dismissed with prejudice."
Defendants do not contest the order, which they requested, requiring them to "buy out" plaintiff's interest in Inmar, a corporation which owned a building in Linden. Defendants challenge the $100,000 damage award for "equitable fraud" attributed to the overvalued purchase price. They argue that the purchase price plaintiff paid for his interest in Inmar was based on figures plaintiff claimed he never saw and, therefore, could not have relied upon, and, in any event, could have verified with his own experts. Defendants also claim that plaintiff cannot base a fraud action upon reliance on their "opinion" of the value of the property and that money damages cannot be awarded as a remedy for equitable fraud. There is no cross appeal.
The parties agree that the Chancery Division's findings of fact are supported by substantial credible evidence in the record. Based on those findings, we hold that the trial judge erred in reaching his legal conclusions. Accordingly, we reverse the award of damages for equitable fraud.

I.
Plaintiff, Dr. Daibo, brought the action against Ned and Melvin Kirsch and other defendants alleging that he was fraudulently induced to invest in Inmar after agreeing to purchase an interest in Linn Associates, a partnership in which the Kirsch brothers (defendants) had the controlling interest.[1] Both entities owned real property in Linden. The Kirsches cross-moved to buy out plaintiff's interest in Inmar "at fair value."
After a trial, the judge found defendants committed no legal fraud, but were liable based on equitable fraud because of an inflated purchase price paid by plaintiff for his share of Inmar. Plaintiff's case centered on defendants' alleged unilateral transfer of plaintiff's initial investment in Linn Associates to an interest in Inmar.
In defending the judgment, plaintiff argues that "the trial court's findings of fact should not be overruled." He thereby acknowledges that there is substantial evidence in the record to support the trial judge's findings of fact. See Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). Accordingly, we quote the judge's material findings at length:
We have a situation in which we have Mel [Kirsch], who is much more sophisticated than Dr. Daibo, selling an interest in a corporation that owns real estate, to a doctor who, in my book, appears to be extremely careless and I used the word "laissez-faire," and I was trying to be kind. This is a man who appears not to be particularly careful in what he does. His credibility is seriously impugned by virtue of the various inconsistencies in his testimony and the exaggerations that I thought were rather self-evident. He's a bit impetuous. He's someone who appears to be, in my mind, opinionated. One who suffers from some kind of an idea that somehow one can be careless with one's investment, and then if something goes wrong, blame the other guy.

*996 He makes a charge that there was a switch that was perpetrated on him, in which he thought he was investing in Linn and he ended up with Inmar, which owns and controls 104 East Elizabeth Avenue, Linden, New Jersey. We have to deal in this court with reality not fantasy.
The judge found that plaintiff, after purchasing an interest in the Linn partnership, entered into an agreement which terminated that interest. The agreement provided that:
The sale agreement is hereby terminated, declared null and void and of no further force and effect, and the parties thereto shall have no further rights or obligations thereunder.
According to the judge:
Simultaneously, there was a stock sale agreement, in which [plaintiff] agreed to purchase 500 shares of common stock of Inmar Associates, a whole different company, a new corporation. This time, for a different percentage of ownership; that is a third ownership as opposed to 22.3 percent. The agreement again is relatively simple, and the doctor wants me to believe that somehow only the signature page was slipped under his nose and he signed it or he didn't read it or Ned told him he doesn't have to read it. I just don't simply believe that.
Thereafter, for several years, plaintiff accepted a return on his investment from Inmar:
He knew exactly what he was signing. He then accepts all these checks, which are D-4. They specifically talk about Inmar Associates, Inc. They don't talk about Linn. And he accepts all these checks.

....
He then, I'm satisfied, got K-1s. The K-1s specifically talk about Inmar Associates, Inc. They talk about a one-third interest. Not a one-third of the Kirschs' interest as portrayed in Linn, but one-third interest, period, end of quote. One-third of the whole [for 1992, 1993, 1994 and 1995].
And at some point during the receipt of a financial statement that he received approximately a year later, he noted an entry that shows me that this man did in fact read financial statements.
The judge noted the good faith basis for the recommended change in plaintiff's investment from Linn to Inmar, essentially because of the financing differences due to the insolvency of the Howard Savings Bank, which was financing the Linn acquisition. The judge also found that plaintiff was refunded a $7,000 difference in purchase price between his share in the Linn and Inmar investments, thus underscoring his knowledge of the ultimate investment made.
I recognize that there's certain burdens of proof, but I also recognize that there's such a thing as being honest, truthful, and straightforward. An honest person doesn't play games with facts. There's no question that the doctor got the $7,000, why he made an issue of it on the witness stand is probably an embarrassment to counsel. In any event, he got the seven. ...
The question is, was he defrauded when he invested $283,000 on a deal in which the projected profit, gross profit, was 61,000 some odd dollarsadmittedly, not fully rentedversus the Linn Associates deal, in which ... he would have a gross profit of maybe $44,000 a year.
Again, the doctor loses his credibility because he exaggerates. He said that Mel guaranteed this to him. The doctor knows better than that. Why do we know that he knows better than that? Because of all of his failed investments in the past. All his tax shelters, his condominiums, and all of the fancy tax shelters that he went into, all fell like a house of cards. He knows, if no one knows, he knows, that there's no such thing as a free lunch. There's no guarantee. Is there a reasonable projection; of course, there is.
The real estate market, despite what the appraisers may have inferred, it was fairly steady; and, admittedly, Linden was probably fairly more steady than others.
The judge nevertheless found that equitable fraud was committed in establishing the purchase price of the Inmar investment.

*997 Now how did this affect this particular deal? I think that what happened here was [Mel] Kirsch committed an equitable fraud on Dr. Daibo. Sounds pretty strong. I don't think that Mel Kirsch is a bad guy. I think Mel Kirsch is a decent human being. But there is no way that you could possibly justify an 850,000-dollar equity in the Inmar property. Forget it. It doesn't even exist.

....
Now Dr. Daibo, to show you how poor an investor he is, you know, knowing all of this, should have realized that you don't pay $283,000 for a projected 20,000-dollar-a-year income, when you can get a projected $44,000 for $7,000 more.
Now they've tried to paint Mel Kirsch as some kind of a villain. I believe that Mel Kirsch realized that there was some financing problems [with the Linn property], vis-a-vis Howard Savings; that this was not the kind of a deal you wanted a medical doctor in. That if they ever had to refinance this, we would be dealing with a doctor who certainly would not have wanted to sign personally. He was an investor, not a promoter, not a developer. He's not a real estate maven or an entrepreneur. He's a medical doctor. He's a professional person. All he wants is a passive investment. He wants to get a return on his money. He doesn't want to get involved in the intricacies of managing property.

....
So everybody is clear here. I don't believe that Mel Kirsch is the kind of person who sat down and rubbed his hands together and said, now how can I defraud Dr. Daibo. I don't believe that. I think what happened here is, he committed equitable fraud because he had no intention of defrauding the doctor, but that's the result of what happened. Because he sold him a bill of goods that even by his own appraiser could not even be substantiated.

....
... And on paper, I don't think there's any question that Linn was the better investment. On the other hand, I think it's disingenuous for the doctor to not consider the fact that maybe Mel did him a favor by not putting him in Linn because I can't conceive in my wildest imagination for the doctor coming up with 120K more, plus signing personally. (emphasis added.)
The judge also concluded that once plaintiff "found out that Linn subsequently was not as good a deal on paper as it was projected, he didn't want Linn," and that he "changed horses in the middle of the stream ... because he knew he had to put up $120,000 and sign personally if he was going to be treated equally with the Kirsch[es]." But with regard to the value of the Inmar property, the judge further noted:
I recognize that Mel Kirsch was not saying, hey, I had the property appraised for 2.1 million. Dr. Daibo knew that. I'm not going to hold Mel Kirsch to an appraisal today of 1.650 or whatever it came to. It's so easy to Monday-morning quarterback somebody who's sitting down over lunch and saying to somebody, look, I got a deal, I think it's a good deal. We can't do that. If Dr. Daibo wasn't sure of the number, he's a big guy. He ought to say, look, Mel, tell you what, I'm going to go out and have the property appraised. He didn't do that. On the other hand, Mel had a concomitant obligation to Dr. Daibo not to exaggerate the value, even though one might do it without the intent, the specific intent, to defraud. (emphasis added.)
In essence, the judge concluded that, while there was no intentional misrepresentation or legal fraud in determining the value of plaintiff's interest in Inmar, equitable fraud was committed by defendant Melvin Kirsch because he induced plaintiff to invest in Inmar at an inflated price:
I'm satisfied that the evidence is clear and convincing that Dr. Daibo obviously overpaid for his investment in Inmar. I do not believe, however, that Meland Ned [an attorney found not to have been plaintiff's attorney] is out of this. Ned, the *998 doctor so exaggerated Ned's participation that it was ridiculous. I'm satisfied Ned Kirsch is an honest, upright attorney, an individual. I was very impressed with his testimony. Mel, too, except that Melyou know, Mel is a businessman. He's trying to get this guy to invest at a time when, hey, the real estate market wasn't the best. But I don't think that Mel is a dishonest person. I think that he didn't commit actual fraud; and, therefore, I award no damages under that claim.
I also find that the defendants did not fraudulently induce the plaintiff into investing in Inmar as a switch-and-bait operation. But I do believe that Mel committed equitable fraud because of the grossly inflated equity estimate.

First of all, and this is second-guessing him, the price should not have been based upon equity, although I know some people use it. Income is the critical one. But that's an aside.
As I said, Mel claimed the property had a sales price of two million one; however, the property had, at best, giving a factor of almost $200,000 as a cushion for Mel, a maximum value of 1.8. Using that estimate as the true original sales price for the whole, the plaintiff's purchase of one-third of the equity interest in the property should have cost him $183,000 instead of $283,000 as the purchase price. That number being rounded off because the 283,000 dollar number was rounded off.

....
Therefore, this caused Dr. Daibo to overpay $100,000 for his interest, and he's entitled to be made whole and awarded that amount as damages for the equitable fraud which I believe was proved clearly and convincingly, not only by the testimonyand not Dr. Daibo's testimony, because I agree with Mr. Snyder [defendants' attorney]; Dr. Daibo is not a credible witness in many instances. What I'm going by is the clear, unequivocal proof presented by the defendants themselves.
The defendant is entitled to buy out the plaintiff's remaining shares of Inmar, and it is so ordered. Ordered for them to buy it and for Dr. Daibo to sell it.
The judge therefore concluded that plaintiff was entitled to receive a return of the excess amount paid for his investment because of the equitable fraud and that defendants were obligated to buy plaintiff's share in Inmar at the then market value of $100,000, with interest on the $100,000 overpayment "because the defendants received the benefit of plaintiff's overpayment from January 1992" to the date of decision in August 1997. The $100,000 damage award was premised on the judge's conclusion that Inmar had a real market value of $1,800,000 at the time of plaintiff's investment, not the $2,100,000 value Mel Kirsch described in the purchase proposal, and that plaintiff should have paid only $183,000 for his one-third interest in Inmar, not the $283,000 he actually paid as a result of Mel Kirsch's "grossly inflated equity estimate."[2] As noted, however, the judge found that there was no "bait and switch" operation and that Mel neither referred to any false or non-existent appraisal nor intended to defraud the plaintiff.

II.
Based on the judge's fact-finding, we reverse the judgment awarding money damages for equitable fraud.

A.
To prove legal fraud, a plaintiff must demonstrate a "material misrepresentation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 624, 432 A.2d 521 (1981). However, unlike legal fraud which may give rise to money damages, equitable fraud does not require proof that the representation was made with "knowledge of its falsity and an intention to obtain an undue advantage therefrom." Id. at 625, 432 A.2d 521. "Scienter is not at issue." Ibid. Thus, to *999 recover based on equitable fraud the plaintiff must prove his or her reasonable reliance on a material misrepresentation of fact. Ibid. See also DSK Enter., Inc. v. United Jersey Bank, 189 N.J.Super. 242, 251, 459 A.2d 1201 (App.Div.), certif. denied, 94 N.J. 598, 468 A.2d 232 (1983). Moreover, a party claiming equitable fraud must prove the required elements by clear and convincing evidence. Stochastic Decisions, Inc. v. DiDomenico, 236 N.J.Super. 388, 395, 565 A.2d 1133 (App. Div.1989), certif. denied, 121 N.J. 607, 583 A.2d 309 (1990).
Defendants contend that the finding of equitable fraud must be reversed. They emphasize that the judge found no intent to defraud and that Mel Kirsch made only an innocent misrepresentation by asserting a sincerely believed, but mistakenly inflated value of the Inmar property. Defendants also contend that plaintiff's reliance on the Inmar proposal[3] could not be deemed "reasonable" because plaintiff was an experienced real estate investor and could have obtained his own appraisals with respect to the value of Inmar. Defendants point to the inconsistency between plaintiff's testimony, rejected by the trial judge, that defendants never showed him any information about the Inmar property and plaintiff's attempt to sustain the finding of equitable fraud which requires proof of reliance. Defendants further assert that, in any event, the proposal contained Mel's opinion as to Inmar's value and that there was no misrepresentation of any "fact." In essence, defendants argue that plaintiff proved neither the "material misrepresentation of fact" nor the "reasonable reliance" elements required to sustain a finding of equitable fraud.
There is no contention that defendants misstated facts (such as the amount of the mortgage, overhead or rent) embodied in the proposal, and the judge made no such finding. To the contrary, the judge found only that "Mel committed equitable fraud because of the grossly inflated equity estimate." The "estimate," however, was not an expression of fact but of opinion based on Mel's assessment of value.
In Garden Realty Corp. v. Hadley, 110 N.J. Eq. 474, 160 A. 385 (E. & A.1932), the Court held that "[r]epresentations by a seller as to the value of his property are not usually a basis for a claim of fraud.... Value is a matter of opinion." Id. at 475-76, 160 A. 385 (citation omitted). Other jurisdictions similarly hold that fraud cannot be predicated on representations as to value. See, e.g., Arnold v. Erkmann, 934 S.W.2d 621, 627 (Mo.Ct. App.1996) ("A statement as to value of property is ordinarily considered an opinion, not a statement of fact"; where a person making the representation has no "special knowledge" or expertise, the state ment constitutes a "representation of value and not a false statement of existing fact"); Wright v. Westside Nursery, 787 P.2d 508, 512-13 (Utah Ct.App.1990) ("misrepresentations as to value do not ordinarily constitute fraud, as they are regarded as mere expressions of opinion or `trader's talk' involving matter of judgment and estimation as to which men may differ"); Cravens v. Skinner, 626 S.W.2d 173, 177 (Tex.App.1981) (absent a confidential relationship, "a representation of market value of a commodity is merely an opinion that cannot be made the basis of a recovery for fraud and deceit"); Clark Sanitation, Inc. v. Sun Valley Disposal Co., 87 Nev. 338, 487 P.2d 337, 339 (Nev.1971) (an "estimate is an opinion and an estimate of value is an opinion as to value upon which reasonable and honorable men may hold differing views. This is the basis for the frequently announced rule that a charge of fraud may not be based upon representations of value").
There was no finding here that Mel falsely represented that he had received an appraisal of $2,100,000. Nor was there any finding that Mel did not honestly hold his opinion as to value, or possessed material information he did not convey. To the contrary, the *1000 judge expressly found Mel had no intent to defraud the plaintiff. In these circumstances, there was no basis on which to find that defendants made a misstatement of material "fact." Cf. Bank of America Nat'l Trust & Sav. Assoc. v. Hutchinson, 212 Cal. App.2d 142, 27 Cal.Rptr. 787, 790 (1963) (developing when expressions of "opinion" may be actionable). Accordingly, we agree with defendants that plaintiff proved no "misrepresentation of fact."

B.
Defendants also contend that by accepting monthly checks for his share of Inmar investment from 1993 through the time of trial in 1997,[4] plaintiff "affirmed" the Inmar transaction and, thus, is "precluded" from "any equitable relief." Defendants point out that the victim of a material misrepresentation has the choice of either rescinding or affirming the contract, see Merchants Indemnity Corp. v. Eggleston, 37 N.J. 114, 130-31, 179 A.2d 505 (1962), and that "delay in [seeking] rescission of the contract is evidence of a waiver of the fraud and an election to treat the contract as valid." Jones v. Gabrielan, 52 N.J.Super. 563, 576, 146 A.2d 495 (App.Div.1958) (quoting Allen v. Logan, 116 N.J. Eq. 550, 552, 174 A. 561 (E. & A.1934)); see also Garden Realty Corp. v. Hadley, supra, 110 N.J. Eq. at 476, 160 A. 385. On the other hand, plaintiff argues that a defrauded party who chooses to "affirm" a transaction may still "sue at law to recover damages sustained as a result of the fraud." See Bilotti v. Accurate Forming Corp., 39 N.J. 184, 199-200, 188 A.2d 24 (1963) (emphasis added). A defrauded party who affirms the contract may recover "the difference between the value of what he received and the value of what he gavean ex delicto recovery." Id. at 200, 188 A.2d 24 (quoting 5 Williston, Contracts § 1523, at 4265 (rev. ed.1937)).
Plaintiff commenced this action in the Chancery Division seeking relief, including the return of his interest in Linn. We need not decide if his prayers for money damages, his abandonment of the prayers for equitable relief, or his unsuccessful effort to transfer the matter to the Law Division can be considered in sustaining a money judgment had there been a finding of legal fraud. Nor need we decide if the monetary award could be deemed equitable relief incident to a rescission or reformation of the Inmar agreement had plaintiff not abandoned his prayer for equitable relief. We note only that there was no apparent rescission or reformation of the Inmar purchase agreement, as plaintiff retained his investment income from Inmar, and defendants were given the right to "buy out" plaintiff's minority interest and ordered to pay $100,000 in damages as a result of the equitable fraud. But money damages cannot be awarded for an equitable fraud. "In an action for equitable fraud, the only relief that may be obtained is equitable relief, such as rescission or reformation of an agreement and not monetary damages." Enright v. Lubow, 202 N.J.Super. 58, 72, 493 A.2d 1288 (App.Div.1985), certif. denied, 104 N.J. 376, 517 A.2d 386 (1986); Foont-Freedenfeld Corp. v. Electro-Protective Corp., 126 N.J.Super. 254, 257, 314 A.2d 69 (App.Div. 1973), aff'd, 64 N.J. 197, 314 A.2d 68 (1974); Gherardi v. Trenton Bd. of Ed., 53 N.J.Super. 349, 366, 147 A.2d 535 (App.Div.1958).

III.
We hold that there was no basis for a finding of equitable fraud based on Mel Kirsch's expression of opinion, and that, even if there were, the trial judge improperly awarded $100,000 in money damages and prejudgment interest thereon. The judgment is accordingly reversed with respect thereto. The judgment is otherwise affirmed.
NOTES
[1] The case against the other defendants was dismissed by consent.
[2] There was a $1,250,000 mortgage on the property at the time of the proposal.
[3] The proposal, based on "gross projected inc[ome]" and "costs," was handwritten by Mel. Plaintiff acknowledged signing the documents by which his interest was transferred from Linn to Inmar but he denied that he was given an opportunity to read them. Plaintiff executed formal typewritten agreements terminating his interest in Linn and purchasing his interest in Inmar. As already noted, the trial judge found that plaintiff signed those documents knowingly and received a $7,000 check representing the difference in the amount of his investment in the two entities.
[4] Plaintiff received $1,000 a month from February 1993 to January 1994, and $1,500 monthly from February 1994 to April 1997.