**In re Bruce Earl PRICE and Angela Jocelyn Price, Debtors.**

**Charles M. Forman, Chapter 11 Trustee for the Estate of Bruce Earl Price and Angela Jocelyn Price, Plaintiff,**

v.

**Amboy National Bank, Defendant.**

**Bankruptcy No. 02–39782 (MBK).**
**Adversary No. 06–1619 (MBK).**

United States Bankruptcy Court,
D. New Jersey.

Feb. 6, 2007.

Michael Kahme, Esquire, Hill Wallack, Princeton, NJ, Attorney for Amboy National Bank.

Joseph M. Cerra, Esq., Forman Holt & Eliades, LLC, Rochelle Park, NJ, Attorneys for Charles M. Forman, Chapter 11 Trustee.

**OPINION**

MICHAEL B. KAPLAN, Bankruptcy Judge.

## I. INTRODUCTION

Plaintiff, Charles M. Forman, the Chapter 11 Trustee for the Estate of Bruce Earl Price and Angela Jocelyn Price (hereinafter "Plaintiff" or "Trustee") brings the within action seeking recovery of attorneys' fees, interest, late fees, sheriff's fees and real estate taxes paid to Defendant Amboy National Bank (hereinafter "Amboy" or "Movant") upon closing on Debtors' real estate in July of 2005. The Trustee asserts causes of actions for accounting and turnover, legal fraud, equitable fraud and conversion. In lieu of an answer to the Trustee's complaint, Amboy filed a "Motion for Summary Judgment in Lieu of Filing an Answer Pursuant to Fed. R. Bankr.P. 7012(b) and 7056." Plaintiff notes correctly in his answering papers that no provision of Fed. R. Bankr.P. 7012(b), or Fed.R.Civ.P. 12(b)-(h), provide for the filing of a summary judgment motion "in lieu of an answer."

There is no dispute that Movant seeks dismissal pursuant to Fed. R. Bankr.P. 7012(b). However, since Movant relies upon submissions to the Court (*i.e.*, certification and exhibits) outside of the pleadings, to which the Plaintiff has had an opportunity to reply, the Court will exercise its discretion to evaluate the matter under both the dismissal standard and summary judgment standard pursuant to Fed. R. Bankr.P. 7056. *See Levitt v. Riddell Sports, Inc. (In re MacGregor Sporting Goods, Inc.),* 199 B.R. 502, 515 (Bankr. D.N.J.1995); *Moran v. Paine, Webber, Jackson & Curtis,* 279 F.Supp. 573, 578 (W.D.Pa.1966) (court treated 12(b)(6) motion as one for summary judgment where movant filed matters outside the pleadings and nonmovant had opportunity to reply), *aff'd,* 389 F.2d 242 (3d Cir.1968); *In re Scionti,* 40 B.R. 947, 948 (Bankr.D.Mass. 1984) (court treated 12(b)(6) motion as one for summary judgment where parties submitted a Stipulation of Facts along with the motion).

## II. JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), and (O).

Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## III. UNDISPUTED FACTS[1]

1. On June 10, 1999, Bruce and Angela Price (hereinafter the "Debtors") executed and delivered a Note (the "Note") to Amboy in the original principal amount of $610,000.00 with interest to accrue on the unpaid principal balance at the fixed rate of 7.375% per annum.

2. In order to secure their obligations to Amboy under the Note, on June 10, 1999, the Debtors executed and delivered a Mortgage (the "Mortgage") to Amboy wherein they granted to Amboy a first mortgage lien on the Property.

3. As a result of the Debtors' default under the Note, on June 27, 2001, Amboy instituted a foreclosure action against the Debtors with respect to the Property in the Superior Court Of New Jersey, Chancery Division, Union County under Docket No. F–12172–01 (the "Foreclosure Action"). On March 15, 2002, a Final Judgment was entered in the Foreclosure Action against the Debtors (the "Foreclosure Judgment"). A sheriff's sale of the Property was then scheduled. On August 26, 2002, two days prior to the sheriff's sale, the Debtors filed the within case for bankruptcy protection under Chapter 11 of the Code.

4. At the outset of this case, Karen E. Bezner, Esquire, then attorney for the Debtors, agreed on their behalf to make the Debtors' present regular monthly mortgage payments due under the Note and Mortgage to Amboy as adequate protection payments in the amount of $5,762.00 per month, a portion of which was for payment of municipal taxes.

From September 2002 through February 2003, the Debtors made their regular monthly payments to Amboy pursuant to the terms of the Note and Mortgage.

5. On March 28, 2003, the Debtors tendered their March 2003 payment which, after presentment, was returned twice for insufficient funds. As a result of the returned check, on April 25, 2003, Amboy filed its first Motion for relief from the automatic stay. A hearing on the Motion was held June 16, 2003, which was settled with an Order entered on July 8, 2003 (the "July 8, 2003 Order") memorializing the agreement of the parties.

6. As a result of the Debtors' failure to make their payments under the terms of the July 8, 2003 Order, on July 1, 2003, Amboy filed a Certification Of Non–Payment seeking relief from the automatic stay. Thereafter, on July 15, 2003, a hearing was held and Amboy was ordered to accept payments on certain terms contained in a July 16, 2003 Order (the "July 16, 2003 Order").

7. On July 22, 2003, check number 221, in the amount of $2,881.00 and check number 222, in the amount of $2,881.00 were returned to Amboy as there were insufficient funds in the Debtors' deposit account on which they were drawn. As a result, on July 22, 2003, Amboy filed its second Certification Of Non–Payment with the Court and requested relief from the automatic stay as the Debtors' defaulted under the terms of the July 8, 2003 Order and the July 16, 2003 Order. On August 27, 2003, a hearing was held and on September 3, 2003, an Order was entered requiring Amboy to accept payments from the Debtors and denying its application for relief without prejudice (the "September 3, 2003 Order").

---

1. The Court has adopted and incorporated in its opinion certain non-controverted facts set forth in the certification of Peter W. Davis ("Davis Cert"), and Exhibits annexed thereto, as well as the Statement of Material Facts accompanying Movant's Motion to Dismiss.

8. On October 30, 2002, Amboy National Bank filed a secured proof of claim in the amount of $714,890.27.

9. By September 3, 2003, the Debtors had tendered numerous checks to Amboy which were returned for insufficient funds and had, in other ways, failed to comply with their obligations as debtors-in-possession. Notwithstanding the numerous defaults by the Debtors under the Orders requiring payment to Amboy, it was precluded from continuing with the Foreclosure Action, seeking to have an Order for Additional Sums entered in state court and from bringing the Property to sheriff's sale despite three applications to vacate the automatic stay.

10. As a result of the Debtors' continued bad faith conduct in the case which culminated in their sale of their real property in Barbados without Court approval, Charles Forman was appointed Chapter 11 Trustee (the "Trustee") on October 2, 2003.

11. As the Debtors failed to make their December 2003 monthly mortgage payment to Amboy as required by the September 3, 2003 Order, on December 16, 2003, Amboy applied for the fourth time for relief from the automatic stay by its filing of a Certification Of Non–Payment. On December 18, 2003, the Trustee's attorney filed a letter with the Court in opposition in which she advised of the Trustee's intent to make payments and further indicated "[i]t is anticipated that upon subdivision approval, the property will have sufficient equity to pay the mortgages on the residence in full, with remaining funds available to pay other unsecured creditors of the estate."

12. Based upon the Trustee's statements in his attorney's December 18, 2003 letter and the receipt of December 2003's monthly mortgage payment, Amboy withdrew its application for relief from the automatic stay.

13. On May 28, 2004, as Amboy had not received the Debtors' May 1, 2004 monthly mortgage payment and as the Debtors had failed to remain current on their property taxes, Amboy applied for relief from the automatic stay pursuant to the terms of the September 3, 2003 Order which was Amboy's fifth application for relief.

14. On June 2, 2004, the Trustee opposed Amboy's fifth application for relief, contending that as a result of the proposed subdivision of the Property, the property would be valued at $1.9 million and would be more than sufficient to pay Amboy in full and that by vacating the stay, a very valuable asset of the estate would be lost.

15. On July 18, 2004, a hearing was held on Amboy's May 28, 2004 application for relief. The court ruled that the automatic stay was to remain in effect and that the Debtors were to remit their June 2004 and July 2004 payments to Amboy by July 30, 2004. As the Debtors failed to remit those payments by July 30, 2004, Amboy filed its sixth application for relief from stay. These six applications had at that time spanned over 15 months. On August 6, 2004, the Trustee filed a letter in opposition to Amboy's application. In that letter, the Trustee indicated that once the Property was subdivided, its value would greatly increase and therefore Amboy was adequately protected. Moreover, the Trustee took the position that if the Property went to sheriff's sale, that its value to the estate would be lost. On or about September 2, 2004, the Trustee forwarded Amboy a check for $6,000.00 and on September 21, 2004, the Trustee filed additional opposition to Amboy's application for relief based upon the fact that Amboy was adequately protected.

16. In the Trustee's September 21, 2004 letter, he requested that Amboy be denied relief from the automatic stay as the Property was worth over $2.1 million. The Trustee further complained that Amboy was continuing to make requests for relief from the automatic stay which were increasing the administrative costs.

17. On December 1, 2004, the Court approved the Trustee's Motion to sell a portion of the Property to two purchasers, Sevy Corp. and U.S. Property Management Corp., LLC. The sales were to be of two lot parcels each. The Debtors and then the Trustee had been attempting to subdivide the Property into five lots (the house and four lots) for years and expected that the Township of Plainfield Planning Board (the "Planning Board") would approve the subdivision. In fact, special counsel had been retained by the Trustee for the application. After Amboy's objection to the proposed sale based upon the proceeds it was to receive, Amboy and Trustee agreed that Amboy was to receive a portion of the proceeds after projected taxes and costs were reserved. Unfortunately, the Planning Board ultimately did not approve the subdivision into five lots.

18. On December 7, 2004, the Court held a hearing on Amboy's sixth application for relief and Amboy was denied its request to continue with the Foreclosure Action. In the Order memorializing the ruling, Amboy's monthly payment was reduced to $1,000.00 and it provided that if Amboy was not paid in full by May 16, 2005, Amboy would be entitled to relief from the automatic stay.

19. On February 9, 2005, as a result of the Debtors' failure to remit the court ordered payments, Amboy made its seventh application for relief; however, as a result of the subsequent compliance by the Debtors and Trustee by making payment, Amboy withdrew that application.

20. On March 24, 2005, the Trustee moved to vacate the prior December 1, 2004 Order approving the sale of the Property as the Township of Plainfield Planning Board was not prepared to allow a subdivision of the Property into 5 lots and sought to cancel the approved contracts and return the deposits to the proposed purchasers. By March 24, 2005, the subdivision process had already lasted over two years and resulted in the estate incurring significant administrative expenses. The Trustee then sought permission to sell the Property either as a whole or in four lots (the house and three subdivided lots). Amboy objected to the Trustee's Motion as a result of the tremendous delay in the case and the Court's December 7, 2004 Order which entitled Amboy to relief from the automatic stay if it was not paid in full by May 16, 2005.

21. The Court granted the Trustee's Motion to vacate over Amboy's objection and left the May 16, 2005 date for relief from the automatic stay in place. Thereafter, on April 20, 2005, Amboy made its eighth application for relief as a result of the Debtors' and Trustee's failure to make the April 1, 2005 payment under the December 7, 2004 Order.

22. On May 11, 2005, the Trustee moved to sell the Property for $2.5 Million, and on May 31, 2005, the Court approved the proposed sale and an Order was entered memorializing the Court decision. In that Order, Amboy was ordered to:

provide a detailed payoff statement detailing (i) the outstanding indebtedness owed to it by the Debtors complete with a breakdown of outstanding principal, interest and costs, including attorneys' fees, escrows and reserves; (ii) payments made to it subsequent to the petition date; and (iii) allocations of said payments within five business days of entry of the within order.

23. In compliance with the Court's order, on June 7, 2005, Amboy provided the Trustee with a payoff statement in the amount of $774,682.04.

24. After his receipt of Amboy's payoff amount, the Trustee objected to Amboy's attorneys' fees and costs and interest based upon the fact that Amboy had a prepetition foreclosure judgment. In order to address the Trustee's objections, Amboy forwarded its Loan History and Escrow History and attorney's invoices to the Trustee, and proposed that the Trustee remit the full payoff requested to Amboy and that he reserve his right to object to attorneys' fees and costs and interest. Moreover, Amboy proposed that in the event the Trustee objected to Amboy's claim, that he reserve $10,000.00 for Amboy's attorneys' fees and costs for it defending that action. On June 29, 2005, Amboy forwarded to the real estate closing attorney and the Trustee its updated payoff letter through July 15, 2005 and its executed Discharge Of Mortgage and Discharge of Lis Pendens. Amboy demanded the payoff amount of $782,365.23, inclusive of: (i) principal of $644,788.85; (ii) interest of $118,446.18; (iii) late charges of $1,053.25; (iv) cancellation and bank service fees of $45.00; (v) legal fees of $8,306.33; and (vi) escrow reserves of $9,725.62.[2]

25. On June 30, 2005, the Trustee forwarded to Amboy's counsel a letter confirming the agreement reached with Amboy, in which counsel for the Trustee states:

By letter dated June 29, 2005 Amboy National Bank issued a payoff statement in the amount of $782,365.23, which includes interest and attorneys' fees (the "Payoff"). The Trustee disputes the amount asserted for interest and attorneys' fees and costs. Per our agreement, the Trustee will pay the total amount asserted by Amboy National Bank under the Payoff with reservation of all claims and rights under state and federal law as to the interest and fees sought by Amboy National Bank in connection with the Payoff. In return, Amboy National Bank has agreed to issue a Discharge Of Mortgage and a Discharge of Lis Pendens (emphasis added).

26. On July 1, 2005, the real estate closing attorney forwarded Amboy a check for the Payoff set forth in Amboy's June 29, 2005 letter which was received by Amboy on July 5, 2005.

## IV. DISCUSSION

The parties do not dispute that the payoff statement, Loan History and Escrow History provided by Amboy to the Trustee included amounts for attorneys' fees, interest, late fees, sheriff's fees and real estate taxes, recoverable pursuant to the terms and conditions of Amboy's Note and Mortgage. The Trustee contends, however, that Amboy is not entitled to rely upon these instruments for payment of such amounts since, as a matter of law, the Note and Mortgage merged into the Foreclosure Judgment obtained prior to the bankruptcy filing, and thus Amboy's payoff statement should have been limited to the fees, costs and interest recoverable under the Foreclosure Judgment only. This Court's determination of Amboy's entitlements must begin with an analysis of the

2. These figures are taken directly from the June 29, 2005 payoff letter annexed as Exhibit JJ to the Davis Certification. The Court is at a loss to reconcile the attorneys fees figure with the $48,689.79 figure set forth in the January 25, 2007 Certification of Michael Kahme, Esq. Likewise, the Court cannot reconcile these figures with those asserted by Joseph Cerra, Esq. in paragraph # 16 of his Brief, dated January 25, 2007. The Court will leave these issues for trial.

Third Circuit's recent pronouncement on the "merger doctrine" in *A & P Diversified Technologies Realty, Inc.*, 467 F.3d 337 (3d. Cir.2006) and the decision's applicability to the case *sub judice.*

In *A & P Diversified, supra,* the debtor had executed a $900,000 promissory note in favor of National Westminster Bank (later merged with Fleet Bank, N.A.), secured by a mortgage. The mortgage provided that, upon default, the debtor agreed to pay the Bank's reasonable attorneys' fees and all other costs and expenses incurred by the bank and that such costs and expenses were secured by the mortgage. It also provided that the debtor waived any present or future law, regulation or judicial decision which conflicted with any provision of the mortgage or other loan documents. The debtor defaulted and foreclosure proceedings were commenced in New Jersey state court. While the foreclosure action was pending, the debtor filed a Chapter 11 petition. Thereafter, the bankruptcy court granted stay relief so as to permit the foreclosure action to continue, resulting in the entry of a foreclosure judgment, which included $7,500 in counsel fees awarded in accordance with N.J. Court Rule 4:42–9(a)(4) (which rule limits the amount of fees that can be awarded in a foreclosure action). The bankruptcy case later was converted to one under Chapter 7 and a trustee was appointed. The Bank collected the full amount of its judgment through the foreclosure.

Subsequent to the foreclosure sale, the trustee filed a motion in the bankruptcy court to expunge the Bank's claim, which the bank opposed, as well as filing a cross-motion seeking attorneys' fees pursuant to 11 U.S.C. § 506(b), which provides:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim interest on such claim, and any reasonable fees, costs or charges provided for under the agreement or State statute under which such claim arose.

The bankruptcy court denied the trustee's motion and granted the cross-motion, awarding attorneys' fees of $304,181.45 and expenses of $32,772.43. The district court affirmed the bankruptcy court's order awarding attorneys' fees. Although the district court acknowledged that normally the merger doctrine extinguishes a creditor's rights under a mortgage once judgment is entered, the court applied an exception to the rule, however, finding that "it is clear from the language of the agreement that the parties intended their rights under the mortgage to be preserved beyond any judgment, more specifically, the state court's foreclosure judgment." *A & P Diversified, supra,* 467 F.3d at 340. The court relied on the following language from the mortgage: "[t]he Mortgagor . . . waives and releases, to the fullest extent it may lawfully do so, all benefit of any present or future moratorium law or any other present or future law, regulation or judicial decisions[.]" *Id.*

The trustee appealed to the Third Circuit which reversed. The trustee argued that the Bank had no entitlement under § 506(b) because the note and mortgage had been merged into the final judgment and thereby were extinguished. The Bank further argued that the loan documents reflected the parties' intent that the merger doctrine would not apply. The court reasoned that, under the merger doctrine, "a contract is deemed to merge with the judgment, thereby depriving a plaintiff from being able to assert claims based on the terms and provision of the contractual instrument." *A & P Diversified, supra,*

467 F.3d at 341; *See also, In re Roach,* 824 F.2d 1370, 1377 (3d Cir.1987). "In this case we find that the lending agreements including the mortgage merged into the final judgment of foreclosure, which ordinarily precludes the recovery of attorneys' fees. Under the merger doctrine, the mortgage and concomitant attorneys' fees provision ceased to exist when the judgment was entered." *A & P Diversified, supra,* 467 F.3d at 343. The Third Circuit did acknowledge that an exception to the merger doctrine applies where "the mortgage clearly evidences [an] intent to preserve the effectiveness of that provision post-judgment." *A & P Diversified, supra,* 467 F.3d at 342; *See also, In re Stendardo,* 991 F.2d 1089, 1094 (3d Cir.1993). The court, however, found the exception to the merger doctrine to be inapplicable and therefore held that the promissory note and mortgage which formed the basis of the Section 506(b) motion had been extinguished.

It goes without saying that *A & P Diversified* is binding on this Court and, at first blush, would support the Trustee's contention that Amboy Bank can look only to the four corners of the March 15, 2002 foreclosure judgment for the recovery of attorneys' fees, late fees, interest and real estate taxes. Nevertheless, I find that the facts in the case before me to be materially distinguishable from the facts presented in *A & P Diversified,* warranting conclusions which differ from those urged by the Trustee. In this regard, and as noted by Amboy Bank in its initial brief[3], the lender in *A & P Diversified* obtained from the bank-

ruptcy court an order granting relief from the automatic stay to continue and complete the state court foreclosure proceeding. Indeed, the lender obtained a final judgment of foreclosure, including attorneys' fees pursuant to Rule 4:42–9(a)(4), as well as substantial taxes and interest. Thus, the lender in *A & P Diversified* had ample opportunity to incorporate into the final judgment any and all fees, costs and charges to which it was entitled. Certainly, it was not unreasonable for the Third Circuit to limit the lender's recovery to the amounts provided by the judgment.

In marked contrast, the lender in the case *sub judice,* Amboy Bank, was restrained in its efforts to continue the state court foreclosure proceeding and prohibited from seeking the entry of an Order for the additional tax advances, attorneys' fees incurred, late fees or additional contract interest. It is undisputed that throughout the course of this bankruptcy case, on *eight* separate occasions, a time span that approached nearly *three years,* Amboy Bank sought relief from the automatic stay to proceed with the foreclosure action, and each time such applications were opposed by either the Debtors or Trustee and ultimately denied or withdrawn. While this Court does not take issue with the holding in *A & P Diversified* to the extent it affirms the merger doctrine and thus limits its recoveries to the amounts included in the foreclosure judgment, it strikes one as patently inequitable that a lender should be limited to the rights under a foreclosure judgment, yet be thwarted in its efforts to include all outlays in the judgment itself.

---

3. Amboy also argues that the Note and Mortgage were reinstated by the actions of the Trustee during the case. This Court strongly disagrees as Amboy has not presented, nor is the Court aware, of any case law holding that reinstatement can occur outside of a confirmed plan, by the mere filing of a bankruptcy proceeding. Nor has Amboy supplied any documentation evidencing that such reinstatement arose through the knowing consent of *all* parties. Frankly, the Court questions whether a mortgagee even would permit such reinstatement, absent a confirmed plan, in light of the potential delays which could arise in the foreclosure proceeding were the case subsequently dismissed.

Indeed, there is a palpable inconsistency in the actions taken by the Trustee to oppose repeatedly and successfully Amboy's applications for stay relief to enforce or add to its foreclosure judgment, while now arguing that Amboy's rights are limited to the terms of the March 15, 2002 foreclosure judgment and seeking to recover all excess amounts paid to Amboy. While the Court believes estoppel should apply to prevent such inconsistent positions, identifying the appropriate legal theory requires further analysis.

 At first blush, the doctrines of judicial estoppel and/or equitable estoppel would appear to address the Court's concerns and preclude the contradictory positions advanced by the Trustee. Yet, upon further analysis, each doctrine seems inapplicable. Judicial estoppel applies when a party asserts a position in one court proceeding and then in bad faith asserts an inconsistent position in another proceeding. *See Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777–78, 782 (3d Cir.2001). Judicial estoppel is a remedy that should be used sparingly, only in egregious cases of misrepresentation. *See Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 324 (3d Cir. 2003). Judicial estoppel is appropriately applied only if no sanction established by a relevant statute or the Federal Rules of Civil Procedure can adequately remedy the damage done by a litigant's misconduct. *See Montrose*, 243 F.3d at 784–85 ("[B]efore utilizing its inherent powers, a district court should consider whether any Rule- or statute-based sanctions are up to the task [of remedying the damage done.]") *(citing, Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108, 110 (3d Cir.1999)). In this case, there is nothing in the record to suggest that the Trustee has asserted his position in bad faith or for any improper purpose. Thus, it would be improper to invoke judicial estoppel.

 Likewise, the Court cannot invoke the doctrine of equitable estoppel to afford relief to Amboy Bank. Equitable estoppel applies when one party rightfully relies on an intentional or negligent representation of fact by another party, who is estopped from later denying that representation because the relying party would be injured. *See In re RFE Indus., Inc.*, 283 F.3d 159, 164 (3d Cir.2002) *(quoting Wheeling–Pittsburgh Steel Corp. v. McCune*, 836 F.2d 153, 162–63 (3d Cir. 1987)). As both parties have acknowledged in their submissions, equitable estoppel results from "voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse." *Clarke v. Clark ex rel. Costine*, 359 N.J.Super. 562, 571, 821 A.2d 104 (App.Div.2003), *(citing, W.V. Pangborne & Co. v. New Jersey Dept. of Transp.*, 116 N.J. 543, 553, 562 A.2d 222 (1989)). The Court does not find, however, that Amboy Bank relied upon any intentional or negligent representations made by the Trustee with respect to payment of fees and costs pursuant to the Note and Mortgage, or changed its position "for the worse" in reliance thereon.

 While neither judicial estoppel nor equitable estoppel can be utilized by the Court to address the inequities arising from the Trustee's inconsistent positions taken in this proceeding, the doctrine of "quasi estoppel" appears to fit the bill. Quasi-estoppel differs from garden-variety equitable estoppel in that there is no requirement of a change in position in reliance upon another's prior conduct. *In re*

*Guterl Special Steel Corp.*, 316 B.R. 843 (Bankr.W.D.Pa.2004); *See also Valentino v. Teamsters Local 469 Pension Fund*, 2000 WL 1879544 (D.N.J.2000). The doctrine, which has its basis in equity, precludes a party from asserting, to another's prejudice, a position that is inconsistent with a previously-held position. *See Erie Telecommunications, Inc. v. City of Erie*, 659 F.Supp. 580, 585 (W.D.Pa.1987). The doctrine applies where it would be unconscionable to permit a person to maintain a position inconsistent with one in which he acquiesced or where he accepted a benefit. *Id.* The "conscience of the court" is repelled by the inconsistency. In common parlance, quasi-estoppel translates into the maxim that "one cannot blow both hot and cold". *Guterl Special Steel, supra*, 316 B.R. at 856 *(quoting, Erie Telecommunications*, 659 F.Supp. at 585). Another court has explained the principal in even clearer terms: "one cannot eat his cake and have it too". *Western Resources, Inc. v. Union Pacific Railroad Co.*, 2002 WL 1462004 (D.Kan.2002).

In the present matter, between December of 2003 and May of 2005, the Trustee vigorously and successfully opposed five different applications filed by Amboy seeking to return to the state court and continue the prosecution of its foreclosure proceeding.[4] In the ordinary course of events, and in light of the delays with respect to the execution on its judgment, Amboy had several options to recoup the additional expenses incurred. For instance, Amboy could have chosen to vacate its foreclosure judgment in order to secure a judgment which included the additional attorneys' fees, contract interest and costs.

Likewise, Amboy could have obtained through the Office of Foreclosure an Order for Additional Sums, pursuant to *R.* 1:34–6(5), in order to recoup post judgment tax payments. Such orders are routinely granted. *See 30A N.J. Prac., Law of Mortgages*, § 31.47 (2d Ed.). In addition, Amboy could have filed a motion seeking an order for approval of the additional attorneys fees and advances. All such procedures are commonplace in the state court foreclosure practice; yet, Amboy was denied an opportunity to obtain such relief due to the Trustee's opposition to Amboy's repeated requests for relief from the automatic stay. The Trustee had his cake. He was able to stave-off Amboy's efforts to complete the foreclosure until he had secured a sale of the real estate.[5] Now he seeks to eat his cake by denying Amboy's recovery of such amounts that Amboy could have incorporated in a foreclosure judgment had it not been stopped in midstream. The unfairness is obvious and warrants an equitable remedy.

As noted recently by the Third Circuit in *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d Cir.2006):

> The Supreme Court has long recognized that bankruptcy courts are courts of equity that apply equitable principles in the administration of bankruptcy proceedings. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) ("[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity."). Though the enactment of the Bankruptcy Code in 1978 "increased the degree of regulation Congress imposed

---

**4.** The Debtors in Possession had opposed the first three applications filed by Amboy prior to the appointment of the Trustee.

**5.** Once again, the Court emphasizes that it finds no "bad faith" or ill motives behind the Trustee's actions; indeed, the Court notes that the Trustee's dogged efforts to pursue a sale of the real estate produced an exceptional sales price and substantial recovery for creditors.

upon bankruptcy proceedings," it did not alter their "fundamental nature" as courts of equity. Official Comm. of Unsecured *Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 567 (3d Cir.2003) (en banc); *see also Young v. United States,* 535 U.S. 43, 50, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) ("[B]ankruptcy courts ... are courts of equity and 'apply the principles and rules of equity jurisprudence.'") (*quoting Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939)) ... [T]he bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates. *See Pepper,* 308 U.S. at 307–08, 60 S.Ct. 238, 84 L.Ed. 281 ("[I]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done...."); *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 235 (3d Cir. 2004) ("Bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process." (internal quotation omitted)). To this end, they may, when necessary, "eschew[ ] mechanical rules," *Holmberg v. Armbrecht,* 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946), "modify creditor-debtor relationships," *United States v. Energy Res. Co.,* 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990), and "craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, effect the result the Code was designed

to obtain," *Cybergenics Corp.,* 330 F.3d at 568. See also 11 U.S.C. § 105(a) (authorizing bankruptcy courts to "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.")

■ The facts presented herein warrant the exercise of this Court's equitable powers to craft a remedy to ensure that Amboy is treated fairly in this proceeding. A strict application of the "merger doctrine," as enunciated in *A & P Diversified, supra,* would serve to handcuff and punish Amboy and similarly situated lenders whose lone "crime" was to obtain a foreclosure judgment prior to the mortgagor's bankruptcy filing.

It is clear that there would not be a dispute today, had Amboy's foreclosure judgment incorporated the fees, costs, interest and advances included in its payoff statement. Unfortunately, the Chancery Court did not have an opportunity either to review or rule upon the appropriateness of these charges. Pertinently, neither the Chancery Court nor the Bankruptcy Court has reviewed the reasonableness of Amboy's requested attorneys fees (beyond those permitted pursuant to *R.* 4:42–9). Likewise, neither court has made a determination that equity requires the calculation of interest at the contract rate, consistent with *Interchange State Bank v. Rinaldi,* 303 N.J.Super. 239, 696 A.2d 744 (App.Div. 1997).[6] Inasmuch as Amboy did file a

**6.** For the benefit of the parties herein, the Court notes its agreement with Plaintiff that the Estate should not be liable to pay a higher contract rate of interest simply because the Debtors filed a bankruptcy petition and sought relief under Title 11. This is contravenes the most fundamental policies behind the Bankruptcy Code. To the extent Amboy

can demonstrate at trial other inequitable conduct by Plaintiff, warranting application of the contract rate of interest herein, the Court will consider such relief. In a similar vein, the Court is unpersuaded that Amboy is entitled, as a matter of law, to recover post judgment late charges. Amboy is welcome at trial to produce evidence that the Office of

secured proof of claim in this proceeding on October 10, 2002, there is no reason why this Court cannot determine the propriety of all the amounts sought by Amboy pursuant to 11 U.S.C. § 502, as well as Fed. R. Bankr.P. 3003 and 3007.

The Court now turns to the issue of whether Amboy is entitled to a dismissal of any of the four counts in the Plaintiff's Complaint. As discussed previously, the motion presently before this Court was raised as a "motion to dismiss." The Court will evaluate the motion under both a dismissal standard and a summary judgment standard. Fed.R.Civ.P. 12(b)(6) provides in relevant part:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

As explained in 10 Collier On Bankruptcy ¶ 7012.04 (15th ed.2006) (footnotes omitted):

> If a motion is made to dismiss a pleading for failure to state a claim, that motion may be treated as one for summary judgment and disposed of pursuant to Civil Rule 56. Such a situation would occur when matters outside of the pleading to which the motion is made, such as an affidavit, are raised by one of the parties and considered by the court. All parties are to be given a reasonable opportunity to present material outside

of the pleadings if the motion is to be considered one for summary judgment.

In the instant case, both the Trustee and the Movant have submitted matters "outside the pleadings." Movant has submitted an extensive certification, with exhibits, upon which it relies in support of its motions to dismiss. The Trustee has submitted a brief in opposition to Amboy's Motion to Dismiss. Moreover, the parties have had the opportunity to submit and reply to the submissions, as well to supplement those submissions with letter briefs addressing issues raised at oral argument. Thus, the Court will additionally evaluate the matter under Fed.R.Civ.P. 56, made applicable to adversary proceedings by Fed. R. Bankr.P. 7056.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In deciding a motion for summary judgment, the judge's function is to determine if there is a genuine issue for trial." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir.1993). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir.2001) *(citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party establishes the absence of a genuine issue of material fact, however, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). A party may not defeat a motion for

Foreclosure or Chancery Court would have allowed such additional charges, post judg-

ment.

summary judgment unless it sets forth specific facts, in a form that "would be admissible in evidence," establishing the existence of a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e) (providing that in response to a summary judgment motion the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). *See also, Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982); *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir.1972). In determining whether a factual dispute warranting trial exists, the court must view the record evidence and the summary judgment submissions in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Issues of material fact are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. An issue is genuine when it is "triable," that is, when reasonable minds could disagree on the result. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

### Legal Fraud

■ The Second Count of Plaintiff's Complaint asserts a claim against Amboy Bank for legal fraud. The Plaintiff asserts that because Amboy intentionally provided the Trustee with an inflated payoff statement, the Trustee suffered damages in reliance thereon. With respect to the necessary elements involving a claim for legal fraud, the court in *House of Drugs, Inc. v. RD Elmwood Assocs. (In re House of Drugs)*, 251 B.R. 206 (D.N.J.2000) noted that:

> [i]n order to establish legal fraud, a plaintiff must prove the following elements: "(1) a material representation by the defendant of a presently existing or past fact; (2) knowledge or belief by the defendant of that representation's falsity; (3) an intent that the plaintiff rely there on; (4) reasonable reliance by the plaintiff on the representation; and (5) resulting damage to the plaintiff." *New Jersey Econ. Dev. Auth. v. Pavonia Restaurant, Inc.*, 319 N.J.Super. 435, 445–46, 725 A.2d 1133 (App.Div.1998) [citations omitted].

*House of Drugs, Inc.*, 251 B.R. at 210. Furthermore, "[t]he elements of fraud must be proven by clear and convincing evidence." *Id.* at 211, *citing Baldasarre v. Butler*, 254 N.J.Super. 502, 521, 604 A.2d 112 (App.Div.1992), *rev'd on other grounds*, 132 N.J. 278, 625 A.2d 458 (1993). Clear and convincing "evidence is that which 'produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established,' evidence 'so clear, direct and weighty and convincing as to enable (the factfinder) to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.' " *In re Samay*, 166 N.J. 25, 30, 764 A.2d 398 (2001) (citations omitted).

■ In the instant action, the evidence demonstrates that the Trustee cannot meet elements (2), (3), and (4) of a claim for legal fraud. With respect to elements (2) and (3), it is undisputed that Amboy based its payoff statement on its business records, including loan history, escrow history, and attorney invoices, which were provided to the Trustee for review. Certainly, Amboy could not have believed that said information was false when in fact it attempted to explain the amounts contained in the payoff statement through various documents and records. At the very least, the evidence establishes that Amboy believed that the information it

provided the Trustee was sufficiently supported by its own records, whether or not that information was in fact accurate. Therefore, the Trustee cannot prove that Amboy knowingly made a false representation. Furthermore, because this Court finds that Amboy set forth what it believed to be an accurate payoff statement, Amboy could not have intended that the Trustee rely on any false representation. Additionally, it is clear that the Trustee cannot meet the reliance requirement necessary to sustain a claim for legal fraud. Despite the Trustee's contention that he reasonably relied on Amboy's payoff statement to his detriment, it is not disputed that the Trustee was provided with substantial documentation (i.e.—business records, loan history, escrow history, and attorney invoices) in support of Amboy's payoff statement. As such, the Trustee was afforded a full opportunity to verify the process by which the amounts included in said payoff statement were calculated. In fact, the Trustee does not dispute that after taking issue with certain claims in the payoff statement that an agreement with a reservation of rights as to attorneys fees, costs, and interest was reached between Amboy and the Trustee. Therefore, the Trustee cannot now claim that he reasonably relied on the payoff statement alone when in fact he was aware of how the figures contained therein were computed and he attempted to protect the interest of the estate by reserving his rights.

Accordingly, Amboy's cross-motion for summary judgment with respect to the Trustee's Second Count is granted and the count is dismissed.

### Equitable Fraud

In his Complaint, the Trustee also asserts a claim for equitable fraud (Third Count). In *Daibo v. Kirsch*, 316 N.J.Super. 580, 720 A.2d 994 (App.Div.1998), the New Jersey Appellate Division explained the differences between legal and equitable fraud:

> [U]nlike legal fraud which may give rise to money damages, equitable fraud does not require proof that the representation was made with "knowledge of its falsity and an intention to obtain an undue advantage therefrom." *Jewish Ctr. Of Sussex County v. Whale*, 86 N.J. 619, 625, 432 A.2d 521 (1981). "Scienter is not at issue." [citations omitted]. Thus, to recover based on equitable fraud the plaintiff must prove his or her reasonable reliance on a material misrepresentation of fact. [citations omitted]. Moreover, a party claiming equitable fraud must prove the required elements by clear and convincing evidence. [citations omitted].

*Daibo*, 316 N.J.Super. at 588, 720 A.2d 994.

In the present matter, the Trustee cannot sustain a claim for equitable fraud. As previously discussed, the Trustee cannot demonstrate that he reasonably relied on the payoff statement alone when in fact he was aware of how the figures contained therein were computed and he was able to protect the interest of the estate by reserving his rights. Therefore, the Trustee cannot prove reasonable reliance and Amboy is granted *partial summary judgment with respect to the Plaintiff's Third Count.*

### Conversion

The Fourth Count of Plaintiff's Complaint alleges that because Amboy misapplied the Debtors' post-petition payments toward its counsel fees and collected certain sums from Amboy's allegedly excessive and inflated payoff statement, the Trustee has a valid claim for conversion. In order to establish a claim for conversion, a plaintiff must prove "(1) that the plaintiff owned, or had a right to use, the property in question at the time of the conversion; and (2) the defendant's actions

constituted an exercise of unlawful dominion over the plaintiff's property by the defendant in a manner that is inconsistent with the plaintiff's title or rights." *Sony Music Entertainment v. Clark Entertainment Group (In re Clark)*, 183 B.R. 73, 76 (D.N.J.1995), *citing Royal Store Fixture Co. v. N.J. Butter Co.*, 114 N.J.Super. 263, 268–269, 276 A.2d 153 (App.Div.1971). Furthermore, in *Advanced Enters. Recycling, Inc. v. Bercaw*, 376 N.J.Super. 153, 161, 869 A.2d 468 (App.Div.2005), the New Jersey Appellate Division held:

> An action for conversion will not lie in the context of a mere debt or chose in action, however. Where there is no obligation to return the identical money, but only a relationship of a debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor.

In this case, there are no issues of fact with respect to the Trustee's conversion claim. It is undisputed that the Trustee, on behalf of the Debtors, made certain payments as outlined in Amboy's payoff statement. As a result of the transaction, Amboy lawfully came into possession of those funds. Consequently, the Trustee's payment and subsequent claim for conversion created a relationship of a debtor and creditor in which the Trustee (as "creditor") asserts that Amboy (as "debtor") owes said monies. Pursuant to *Advanced Enters. Recycling, Inc., supra,* such a relationship places no obligation on Amboy to return the identical money. Therefore, the Trustee's action for conversion must be dismissed and partial summary judgment in favor of Amboy on this count will be granted.

*Accounting and Turnover*

We now turn to address the First Count of the Complaint, seeking turnover and an accounting. The Court is unper-

suaded that either party is entitled to summary judgment on this count, as a matter of law or predicated on undisputed facts. Indeed, the Court regards a trial necessary to resolve the following issues: (1) the reasonable amount attorneys fees owing Amboy with respect to fees arising in connection with the bankruptcy proceeding, (2) whether the equities of the case warrant application of the contract rate of interest, post judgment, (3) the proper principal balance to utilize as a starting point in the pay off calculation, and (4) the proper calculation of accruing interest in light of the fact that Amboy erroneously applied payments made during the case towards its attorneys fees, in lieu of principal and interest, prior to any court ruling on said fees.

Appropriate Orders will be entered.