SHATINA D. SUAREZ, PLAINTIFF–APPELLANT/CROSS–RESPON-
DENT, v. EASTERN INTERNATIONAL COLLEGE, F/K/A MI-
CROTECH TRAINING CENTER, INC., DEFENDANT–RESPON-
DENT/CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 29, 2011—Decided August 23, 2012.

14

16

Before Judges MESSANO, ESPINOSA and KENNEDY.

*Jeffrey W. Herrmann* argued the cause for appellant/cross-respondent (*Cohn Lifland Pearlman Herrmann & Knopf LLP*, attorneys; *Mr. Herrmann*, of counsel and on the brief; *Alex A. Pisarevsky*, on the brief).

*Joseph A. Defuria* argued the cause for respondent/cross-appellant (*Gaccione Pomaco, P.C.*, attorneys; *Mr. Defuria*, of counsel and on the brief; *Anthony G. Del Guercio*, on the brief).

The opinion of the court was delivered by

ESPINOSA, J.A.D.

Defendant, Eastern International College, was formerly known as Micro Tech Training Center (Micro Tech), a for-profit technical school. Plaintiff Shanita D. Suarez enrolled in its diagnostic medical ultrasound technician (DMUT) program after an admissions representative told her that upon graduation, she would be able to perform ultrasounds on patients in hospitals and clinics and earn $65,000 per year. In this lawsuit, alleging violations of the Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –195, and common law fraud, she contends that these representations were false. She alleges that, to obtain employment in this field, it was necessary to obtain ARDMS [1] certification. Because Micro Tech lacked necessary accreditation, she was not eligible upon graduation to take the examination administered by ARDMS to obtain the certification required by potential employers. She contends that, as a practical matter, she cannot either attain the credentials necessary to be eligible to take the ARDMS examination or obtain employment as an entry level sonographer.

Plaintiff now appeals from an order that granted summary judgment to defendant, dismissing her complaint. Defendant cross-appeals, arguing that plaintiff's CFA claim should have been dismissed as barred under a "learned professional" exemption. For the reasons that follow, we affirm the dismissal of plaintiff's common law fraud claim, reverse the dismissal of her CFA claim, and reject defendant's argument that the "learned professional" exemption applies.

I

■ Consistent with the standard applicable to summary judgment motions and our review, we summarize the facts in the light most favorable to plaintiff, giving her the benefit of all favorable inferences in support of her claims. *R.* 4:46–2(c); *Parks v.*

---

[1] American Registry for Diagnostic Medical Sonography

*Rogers,* 176 *N.J.* 491, 494–95, 825 *A.*2d 1128 (2003); *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

Plaintiff left school after tenth grade and got her GED in 1995 when she was seventeen. A lack of daycare for her son thwarted her subsequent effort to obtain training in nursing. She also had to leave a computer training course two months short of completion because she could not afford the financial aid payments. At the time of her deposition, she had five children, ages sixteen, thirteen, ten, and six years old and eight months old, and was earning fifteen dollars per hour as a temporary billing clerk at a hospital.

Plaintiff learned of Micro Tech from an advertisement in the New York Post in May 2005. She contacted the school and met with a Mr. Brown, the admissions representative, and Patricia Washington, whom she believed was the dean of the school. She described her first meeting with Brown:

> Mr. Brown, he explained to me how the—what the program that I would be graduating, and I would be performing ultrasound after graduation on patients in the hospital and in the clinic. And he told me I needed to take a pre-entrance exam to get into the school. And he told me that once I graduate that I would be making good money and it would make my life different from what it is already before I came in there. And that I would be earning close to 65,000 a year, more than what nurses earn. Because I told him I had previously tried to become a nurse and he said, You would make more money as an ultrasound technologist than a nurse would.

Brown told her the program would last thirty-six months in the evening and twenty-four months in the day. Brown did not tell her about any certification requirements upon graduation or make any representations about obtaining certification. He did not state that Micro Tech guaranteed employment but said there was job placement available.

Plaintiff took the pre-entrance exam that day. She understood the results would dictate whether she could attend the school but was told "not to worry about it if [she] didn't do well." Although plaintiff's math results were "a little underscore," Washington told plaintiff not to worry about it.

Plaintiff decided to attend Micro Tech. She applied for financial aid and received a $5,000 grant and $17,000 in loans. Since graduation, she has received deferment of her obligation to repay the loans from Sallie Mae because of her low income.

Plaintiff received a catalog from Micro Tech when she started school. The catalog stated that, upon completion of the program, a student can obtain employment within a hospital or clinical setting as an ultrasound technologist and that the program would emphasize the requirements to obtain ARDMS certification. She asked the dean about ARDMS and was told she did not need to worry about it until after she graduated.

Plaintiff was one of approximately eight students in Micro Tech's inaugural DMUT class. She attended evening classes, meeting Monday through Thursday from 6:00 to 10:30 p.m., from May 2005 through January 2008. Plaintiff also completed six hundred hours of clinical work, performing ultrasound studies on patients in a lab setting. She received a diploma certificate in June 2008, that stated,

Shatina D. Suarez
Has successfully completed
2535 hours of
Diagnostic Medical Ultrasound Technician
At
Micro Tech Training Center, Inc.
Jersey City, New Jersey
On
June 18, 2008

Plaintiff then started "vigorously" looking for employment. At the end of September 2008, the placement representative at Micro Tech sent her to interview with a woman named Anna at On–Site Imaging (On–Site) in southern New Jersey. Anna told her that as a new graduate, she would have to prove herself by scanning patients and that if she did so satisfactorily until November, she would be hired as a full-time employee and would be scanning various patients near her area as opposed to where she was being sent. Plaintiff did approximately thirty ultrasound scans for On–

Site from September to mid-October 2008. Anna paid her twenty-five to thirty dollars for each test, and ten dollars per hour for travel time from On–Site to the patient.

In the beginning, plaintiff was told the scans she did were fine. After a few weeks, Anna told her there had been complaints about the way she filled out the forms that were turned in to the radiologist. Plaintiff knew one ultrasound was re-done.

According to plaintiff, Anna told her in mid-October that she did not have any patients for her. At the beginning of November, Anna told plaintiff she had a patient for her to scan that weekend and then, at the last minute, Anna contacted plaintiff and told her she could not send her out on any more patients until plaintiff met with her senior technologist. Plaintiff called him several times but the technologist never returned her calls. Plaintiff contacted Anna to ask if she could meet with someone else. Anna replied that she would get back to her but did not do so. Plaintiff kept calling, and finally, someone from On–Site told her to return the GPS given to her. At the end of January 2009, Anna called plaintiff and told her she could not be responsible for her driving so far from her residence to the locations she sent her to see patients; and that she could not provide plaintiff any more work unless she moved closer to the area.

In plaintiff's view, she was never employed by On–Site. She explained, "I didn't have employment. I never filled out a W–2. It was just promised to me that if I completed X, Y and Z, I would have employment in the future."

Every effort plaintiff made to secure employment thereafter failed because, she was told, she needed ARDMS certification to work as an ultrasound technician. However, to be eligible to take the examination for ARDMS certification, one had to satisfy pre-requisites that varied depending upon educational background. A student who graduates from a program accredited by the Commission on Accreditation of Allied Health Education Programs (CAA-

HEP)[2] is eligible to take the examination without any additional clinical ultrasound experience.

Micro Tech was not accredited by CAAHEP. As a result, its graduates were not eligible to take the ARDMS certification unless they also completed twelve months of full-time clinical ultrasound/vascular experience. However, without an ARDMS certification, no one was willing to provide plaintiff with the required twelve months of experience.[3]

In his letter report, plaintiff's expert, Fitzgerald Silvera, RT, MS, CRA, provided an explanation for this:

CareCore National, a benefit management company hired by most of the major insurance companies (Aetna, BCBS, Healthnet, United [H]ealth, Oxford and GHI) to either pay for imaging services, pre-authorize examinations or both, [has] unequivocally stated that, "CareCore standards state that all non-certified U/S technologist and non-board certified radiologist, may no longer render services to patients whose health plans are clients of Care Core National."

According to Silvera, an ultrasound services provider that used an uncertified technologist also ran the risk of being barred from the payer network. In addition, the provider could be subject to fines that "can be severe and may be calculated retroactively at the payer's discretion." Silvera noted that "[m]ost reputable employers will not take that risk."

Over the three years she was at Micro Tech, no one told plaintiff about ARDMS requirements or that she would have to obtain twelve months of experience in order to be eligible for the examination. Plaintiff did not know of anyone who went to Micro Tech with her who obtained ARDMS certification.

---

[2] Programs at Bergen Community College, Gloucester County College, Muhlenberg Regional Medical Center, Sanford Brown Institute and the University of Medicine and Dentistry of New Jersey are accredited by CAAHEP.

[3] Plaintiff testified that the work she did for On–Site could not be applied to the twelve-month requirement because ARDMS also required "that you have to be employed for a facility and a certain amount of time and a physician has to sign off on the test that you do" by completing a form from ARDMS.

Plaintiff denied that she was an "entry level sonographer," stating, "There's no facility to hire me as an entry level sonographer. I don't have experience. Entry level would be at least getting you into the door." She explained her reason for contacting a lawyer:

I felt like I was sold goods that were no good, that I could do nothing with. I paid for something that I couldn't do anything with.

. . . .

I can't do anything with the certificate without ARDMS. And I can't get an ARDMS license without working for 12 months, and I've just been going in one big circle.

Plaintiff did not review Micro Tech's website until after she enrolled and did not read the website entry about the DMUT program until after she graduated. She does not contend that she relied upon the website in deciding to enroll at Micro Tech. However, because the contents of the website are included in the record and were relied upon by the motion judge, we include a pertinent section of them here:

Objectives: The Diagnostic Medical Ultrasound Technician Program is designed to help students work effectively in a health-care environment. They will learn to perform ultrasound examinations coupled with a basic understanding of patient care in relation to performing their duties as entry-level sonographers.

. . .

*Emphasis will be placed on information and techniques necessary for ARDMS* (American Registry of Diagnostic and Medical Sonography).

There will be a clinical externship where the student spends 600 hours in a clinical ultrasound department or hospital ultrasound department, applying knowledge gained in the didactic section of the program. At the conclusion of the clinical externship, students will receive a diploma in Diagnostic Medical Ultrasound Technician.

*Graduates will be ready to enter the health-care field as professionals,* responsible for gathering information to aid with patient diagnosis.

*The students graduating from this program will be prepared to work in a variety of imaging laboratories, hospital and clinics as entry-level sonographers.*

. . . .

Micro Tech Training Center is committed to the educational and professional enrichment of each student. The curriculum and environment provide an atmosphere in which students can excel and develop competence in their chosen field.

The school takes pride in *preparing individuals for the workplace.* With a hands-on approach to training, students acquire practical, *marketable* skills.

[ (Emphasis added.) ]

The website lists the following "Accreditations & Licenses":
Accredited by ACCSCT.[4]
Licensed by New Jersey Dept. of Education.
Approved for "Title IV" [5] by U.S. Dept. of Education

## II

In this lawsuit, plaintiff alleges that defendant knowingly omitted material facts, i.e., (1) defendant's graduates were not eligible to sit for the examination required to obtain ARDMS certification without twelve months of additional full-time experience, (2) graduates of programs accredited by an agency recognized by ARDMS are eligible to sit for the examinations required to receive ARDMS certification, and (3) because they were not eligible for ARDMS certification, graduates of defendant's DMUT Program would, by and large, not be able to obtain work in their field.

Plaintiff also alleges that defendant made an affirmative misrepresentation, that upon graduation, she would have the qualifications needed to obtain a job as a sonographer in hospitals and clinics.

Defendant filed a motion for summary judgment, arguing that the complaint should be dismissed because, as a "learned professional," it fell outside the scope of the CFA. The trial court rejected defendant's "learned professional" argument on procedural grounds because it had not been pleaded as an affirmative

---

[4] The Accrediting Commission of Career Schools and Colleges of Technology (ACCSCT) is a private accrediting agency and its accreditation is not recognized in determining a graduate's eligibility to take the ARDMS examination without the additional twelve months full-time experience.

[5] Title IV of the Higher Education Act of 1965, *Pub.L.* No. 89–329, 79 *Stat.* 1219 (codified as amended 20 *U.S.C.* § 1070 *et seq.*); 42 *U.S.C.* 2751 *et seq.* We note that 34 *C.F.R.* § 668.75 specifically prohibits any institution eligible for participation in Title IV programs from describing its participation "in a manner that suggests approval or endorsement by the U.S. Department of Education of the quality of its educational programs."

defense and defendant had not sought to amend its answer on a timely basis to include that defense.

Defendant also argued that the alleged misrepresentations were merely hopes and aspirations regarding its curriculum and that plaintiff's reliance upon them was not reasonable. In support of its motion, defendant cited the deposition testimony of its president, Bashir Mohsen, which it described as follows: "to the best of his knowledge, ARDMS certification is not required to obtain employment as an ultrasound technician; nor is ARDMS certification required for a medical provider to obtain insurance payments for ultrasounds."

The court granted summary judgment to defendant, finding there was no genuine issue of fact that defendant had made any actionable misrepresentation. In doing so, the trial court reviewed the contents of defendant's website, which plaintiff did not rely upon, elected to rely upon statements made by defendant's president that conflicted with evidence presented by plaintiff and accepted defendant's characterization of plaintiff's association with On–Site as proof of her employability despite plaintiff's assertions to the contrary.

The court reviewed the contents of defendant's website and concluded, "there seems to be no dispute that the program enabled Ms. Suarez to obtain employment as a sonographer after her graduation from the program and in that regard, it lived up to its representations." The court found no affirmative misrepresentation that plaintiff would obtain any certification or qualification that the school could not provide. Rather, the court found, "defendant never claimed to be certified, they seem to only advise that it sought to teach the students the skills necessary for ARDMS testing and entry level sonography positions." Therefore, the court reasoned, plaintiff "got the benefit of her bargain[.]" The court also found no issue of fact as to whether defendant intended to deceive plaintiff.

The judge noted the president of the school had "[testified] that ARDMS certification isn't required to get employment as an entry

level sonographer." The judge discounted the opinion of plaintiff's expert to the contrary. She described his conclusion "that an individual in the plaintiff's position faces difficult job prospects" as insufficient to create an issue of fact. Despite plaintiff's insistence that she was not employed by On–Site and was unable to obtain employment because she lacked an ARDMS certification, the court found she "was employed as a sonographer and could continue to seek work as such." The judge found further that "the possibility exists for those in Ms. Suarez's position to eventually achieve the accreditation" by completing twelve months of clinical experience.

The court granted summary judgment, dismissing the CFA claim. The court also concluded that dismissal of plaintiff's common law fraud claim was appropriate, concluding that neither the statements on the website nor the statements made by Brown were false or misleading and, further, that she had not relied upon the statements made on the website.

In this appeal, plaintiff argues that the trial court erred in dismissing her CFA claim because defendant knowingly omitted material facts and made affirmative misrepresentations to her. She also contends that the trial court erred in holding defendant had not committed common law fraud. Defendant cross-appeals, arguing that the trial court erred in not barring plaintiff's claims pursuant to the "learned professional" exemption to the CFA.

III

In our review of the order granting summary judgment, we apply the same standard as the trial court. *Spinks v. Twp. of Clinton,* 402 *N.J.Super.* 465, 473, 955 *A.*2d 304 (App.Div.2008), *certif. denied,* 197 *N.J.* 476, 963 *A.*2d 845 (2009). Summary judgment is appropriate if the competent evidential materials presented, when viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2(c); *see also Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146. "An issue of fact is

genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." *R.* 4:46–2(c).

In considering the merits of a summary judgment motion, it is "not the court's function to weigh the evidence and determine the outcome but only to decide if a material dispute of fact exist[s]." *Gilhooley v. Cnty. of Union,* 164 *N.J.* 533, 545, 753 *A.*2d 1137 (2000) (citing *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146). "If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a 'genuine' issue of material fact for purposes of *Rule* 4:46–2." *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146; *Mandel v. UBS/PaineWebber, Inc.,* 373 *N.J.Super.* 55, 71, 860 *A.*2d 945 (App.Div.2004), *certif. denied,* 183 *N.J.* 213, 871 *A.*2d 91 (2005). However, when there are conflicting versions of the facts that would permit a rational jury to choose either version, the resolution of that conflict requires a determination of which version is more credible. Such a factual dispute should be decided by a jury, not a court, *Rowe v. Mazel Thirty, LLC,* 209 *N.J.* 35, 50, 34 *A.*3d 1248 (2012); and it is improper for the motion judge to "abrogate[ ] the jury's exclusive role as the factfinder." *Conrad v. Michelle & John, Inc.,* 394 *N.J.Super.* 1, 13, 925 *A.*2d 54 (App.Div. 2007); *see also Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146; *Singer v. Beach Trading Co.,* 379 *N.J.Super.* 63, 73, 876 *A.*2d 885 (App. Div.2005); *Davin, L.L.C. v. Daham,* 329 *N.J.Super.* 54, 71, 746 *A.*2d 1034 (App.Div.2000) (conflicting certifications of experts presented a genuine issue of material fact, "precluding an award of summary judgment and requiring submission of the issue to the ultimate finder of fact").

In our review, we first determine whether the moving party has demonstrated that there are no genuine disputes as to material facts, and then we decide whether the motion judge's application of the law was correct. *Atl. Mut. Ins. Co. v. Hillside*

*Bottling Co.,* 387 *N.J.Super.* 224, 230–31, 903 *A.*2d 513, (App.Div.), *certif. denied,* 189 *N.J.* 104, 912 *A.*2d 1264 (2006). We review issues of law de novo and accord no deference to the motion judge's conclusions on issues of law. *Zabilowicz v. Kelsey,* 200 *N.J.* 507, 512–13, 984 *A.*2d 872 (2009). Here, we are satisfied that there were genuine issues of fact as to plaintiff's CFA claim that precluded summary judgment.

## IV

We briefly address the dismissal of plaintiff's common law fraud claim.

"A misrepresentation amounting to actual legal fraud consists of a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." *Jewish Ctr. of Sussex Cnty. v. Whale,* 86 *N.J.* 619, 624, 432 *A.*2d 521 (1981). Thus, the five essential elements to a claim of common law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 610, 691 *A.*2d 350 (1997); *Walid v. Yolanda for Irene Couture, Inc.,* 425 *N.J.Super.* 171, 180, 40 *A.*3d 85 (App.Div.2012).

Since reasonable reliance is a critical element of plaintiff's fraud claim, we narrow our focus to the statement relied upon by plaintiff, Brown's representations at the initial interview. She asserts that Brown knowingly omitted material facts, i.e., that Micro Tech graduates would not be eligible to take the ARDMS examination and that without ARDMS certification, they would be largely unemployable as diagnostic sonographers. She also contends that he made an affirmative misrepresentation—that upon graduation, she would be performing ultrasounds on patients and making close to $65,000 per year.

██ Plaintiff has identified no evidence in the record to establish that Brown knew any statement he made was false. Even assuming he had a duty to disclose the facts regarding ARDMS eligibility and certification, *see United Jersey Bank v. Kensey*, 306 *N.J.Super.* 540, 558, 704 *A.*2d 38 (App.Div.1997), *certif. denied,* 153 *N.J.* 402, 709 *A.*2d 795 (1998), there is no evidence he was aware of their materiality and knowingly omitted those facts from his representations.

██ As to the claims of affirmative misrepresentation, plaintiff must show the misrepresentation of a fact that exists at or before the time the representation is made. *See Mango v. Pierce–Coombs,* 370 *N.J.Super.* 239, 253, 851 *A.*2d 62 (App.Div. 2004). Hence, neither expressions of opinion, *see, e.g., Daibo v. Kirsch,* 316 *N.J.Super.* 580, 589, 720 *A.*2d 994 (App.Div.1998) (seller's representation as to value of property is a "matter of opinion" and "not usually a basis for a claim of fraud" (internal citation and quotation marks omitted)), nor "puffery," *see, e.g., Trs. of Columbia Univ. v. Jacobsen,* 53 *N.J.Super.* 574, 148 *A.*2d 63 (App.Div.) (university's expressions of goal of teaching wisdom to students was not a statement of fact), *appeal dismissed,* 31 *N.J.* 221, 156 *A.*2d 251 (1959), *cert. denied,* 363 *U.S.* 808, 80 *S.Ct.* 1243, 4 *L.Ed.*2d 1150 (1960), will satisfy this element of fraud. Brown's statements regarding plaintiff's potential employment and earning capacity were not statements of present or previously existing facts and therefore cannot provide the basis for a claim based on common law fraud.

We are satisfied that, on this record, the dismissal of plaintiff's common law fraud claim was appropriate.

V

██ We next consider whether a genuine issue of fact existed as to plaintiff's CFA claim. To recover under the CFA, plaintiff must prove that a person has committed an unlawful practice; that she suffered an "ascertainable loss[;]" and that there was a causal relationship between the unlawful conduct and the ascer-

tainable loss. *Gonzalez v. Wilshire Credit Corp.*, 207 *N.J.* 557, 576 (2011).

In pertinent part, *N.J.S.A.* 56:8–2 defines an unlawful practice under the CFA as follows:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale [6] or advertisement of any merchandise [7] or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice[.]

Thus, the statute identifies two categories of unlawful practices,[8] affirmative acts of deception and knowing omissions of material fact. The criteria for satisfying the elements for each of these categories differ.

 A violation based on one of the affirmative acts does not require proof that the defendant intended to commit an unlawful act or intended to deceive the plaintiff. *Cox v. Sears Roebuck & Co.*, 138 *N.J.* 2, 17–18, 647 *A.2d* 454 (1994); *see also Thiedemann v. Mercedes–Benz USA, LLC*, 183 *N.J.* 234, 245, 872 *A.2d* 783 (2005); *Vagias v. Woodmont Properties, L.L.C.*, 384 *N.J.Super.* 129, 133, 894 *A.2d* 68 (App.Div.2006). An affirmative misrepresentation, the affirmative act alleged by plaintiff here, is "one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Gennari v. Weichert Co. Realtors*, 288 *N.J.Super.* 504, 535, 672 *A.2d* 1190 (App.Div.1996), *aff'd*, 148 *N.J.* 582, 691 *A.2d* 350 (1997); *Ji v. Palmer*, 333 *N.J.Super.* 451, 462, 755 *A.2d* 1221

---

[6] "Sale" includes "any sale, ... offer for sale, ... or attempt directly or indirectly to sell[.]" *N.J.S.A.* 56:8–1(e).

[7] "Merchandise" includes "any ... services or anything offered, directly or indirectly to the public for sale." *N.J.S.A.* 56:8–1(c).

[8] A third category of "unlawful practice," not applicable here, concerns the violation of regulations enacted under *N.J.S.A.* 56:8–4.

(App.Div.2000). As is the case with all affirmative acts, a person who makes an affirmative misrepresentation "is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." *Gennari, supra,* 148 *N.J.* at 605, 691 *A.*2d 350.

■ However, a plaintiff who alleges consumer fraud based upon a defendant's omission "must show that the defendant acted with knowledge, and intent is an essential element of the fraud." *Bosland v. Warnock Dodge, Inc.,* 197 *N.J.* 543, 556, 964 *A.*2d 741 (2009) (quoting *Cox, supra,* 138 *N.J.* at 18, 647 *A.*2d 454) (internal quotation marks omitted).

■ Although initially designed to combat "sharp practices and dealings" that victimized consumers by luring them into purchases through fraudulent or deceptive means, the CFA is no longer aimed solely at "shifty, fast-talking and deceptive merchant[s]." *Cox, supra,* 138 *N.J.* at 16, 647 *A.*2d 454 (quoting *D'Ercole Sales, Inc. v. Fruehauf Corp.,* 206 *N.J.Super.* 11, 23, 501 *A.*2d 990 (App.Div.1985)) (internal quotation marks omitted). The goal of this remedial legislation is to establish "a broad business ethic," promoting a standard of conduct that contemplates "good faith, honesty in fact and observance of fair dealing.'" *Meshinsky v. Nichols Yacht Sales, Inc.,* 110 *N.J.* 464, 472, 541 *A.*2d 1063 (1988) (quoting *Kugler v. Romain,* 58 *N.J.* 522, 544, 279 *A.*2d 640 (1971)) (internal quotation marks omitted). Therefore, the CFA is "intended to protect consumers from deception and fraud, 'even when committed in good faith.'" *Ji, supra,* 333 *N.J.Super.* at 461, 755 *A.*2d 1221 (quoting *Gennari, supra,* 148 *N.J.* at 604, 691 *A.*2d 350).

■ "[N]ot just any erroneous statement will constitute a misrepresentation prohibited by" the CFA. *Gennari, supra,* 148 *N.J.* at 607, 691 *A.*2d 350 (internal quotation marks and citations omitted). However, a practice may be unlawful "whether or not any person has in fact been misled, deceived or damaged thereby[.]" *N.J.S.A.* 56:8–2; *Gonzalez, supra,* 207 *N.J.* at 576–77, 25

*A.*3d 1103; *see also Cox, supra,* 138 *N.J.* at 17–19, 647 *A.*2d 454; *Branigan v. Level on the Level, Inc.,* 326 *N.J.Super.* 24, 31, 740 *A.*2d 643 (App.Div.1999). It is the capacity to mislead that is the "prime ingredient of all types of consumer fraud" under the CFA. *Cox, supra,* 138 *N.J.* at 17, 647 *A.*2d 454; *Quigley v. Esquire Deposition Servs., LLC,* 409 *N.J.Super.* 69, 78, 975 *A.*2d 1042 (App.Div.2009), *certif. denied,* 201 *N.J.* 154, 988 *A.*2d 1177 (2010), *cert. denied,* —— *U.S.* ——, 130 *S.Ct.* 3473, 177 *L.Ed.*2d 1057 (2010). Consistent with that goal, the CFA and attendant regulations are "also designed to promote the disclosure of relevant information to enable the consumer to make intelligent decisions in the selection of products and services." *Div. of Consumer Affairs v. Gen. Elec. Co.,* 244 *N.J.Super.* 349, 353, 582 *A.*2d 831 (App.Div.1990). Therefore, the CFA may be violated by an affirmative misrepresentation so misleading as to a fact material to the consumer's decision that the consumer is effectively deprived of the ability to make an intelligent decision.

In *Vagias, supra,* the plaintiffs told their realtor they wanted to buy a house in the "Montville" section of Montville Township, as opposed to two other sections of town. 384 *N.J.Super.* at 131, 894 *A.*2d 68. After the builder represented—falsely—that the house was in the Montville section, the realtor referred to the house as being in "Montville." *Id.* at 131–32, 894 *A.*2d 68. The plaintiffs acknowledged that the realtor did not knowingly misrepresent the location of the house but contended that her conduct violated the CFA "because she made an affirmative false statement which concerned a matter of considerable consequence in the transaction and on which they relied to their detriment." *Id.* at 132, 894 *A.*2d 68. The trial court granted summary judgment to the realtor. The court reasoned that since the misstatement was made by omitting the word "Township" when she described the house as being in "Montville," the realtor's error was an omission, which required knowledge, rather than an affirmative misrepresentation. *Id.* at 133, 894 *A.*2d 68. In addition, the motion judge concluded that the statement was "puffery" rather than actionable conduct under the Act. *Ibid.*

In reversing, we viewed the failure to advise the plaintiffs of the true location of the house as an affirmative misrepresentation, stating:

> If [the realtor] provided plaintiffs with *affirmative misinformation on what she knew was a critical issue in their decision* to purchase the house, she violated the [CFA]. Further, she was not an innocent bystander making a casual comment. She was assisting plaintiffs in choosing a house to buy, and she received a commission on the sale.
>
> [*Id.* at 134–35, 894 *A*.2d 68 (emphasis added) (internal citations omitted).]

The realtor's statement that the house was in "Montville" was literally true but, because it failed to give accurate information about a fact that was material to the buyer's decision, it had the capacity to mislead them. As a result, the omission of accurate information about that material fact rendered the statement an affirmative misrepresentation actionable under the CFA.[9] *See Smajlaj v. Campbell Soup Co.,* 782 *F.Supp.*2d 84, 98 (D.N.J.2011) (a literally true statement can still have the capacity to mislead the average consumer and therefore, fall within the purview of the CFA); *cf. In re Shack,* 177 *N.J.Super.* 358, 363, 426 *A*.2d 1031 (App.Div.1981) (stating that "a half-truth can be as deceptive as a positive misrepresentation" (internal citation and quotation marks omitted)), *certif. denied,* 87 *N.J.* 352, 434 *A*.2d 95 (1981).

 A statement or matter is material if:

> (a) a reasonable man would attach importance to its existence in determining his choice of action ...; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.
>
> [*Restatement (Second) of Torts* § 538(2) (1977).]

The statements regarding plaintiff's ability to be employed as an entry level sonographer are material under either of the *Restatement's* tests.

---

[9] In our view, the specific allegations of "knowing omissions" alleged by plaintiff are essentially subsumed in the allegation of the affirmative misrepresentation that, following completion of the Micro Tech DMUT program, she would be able to be employed as an entry level sonographer and do not require further analysis.

Our consideration of the materiality of this statement to the "reasonable" person is informed by federal regulations in the area. The United States Department of Education established regulations pursuant to 20 *U.S.C.* § 1094 to prohibit institutions eligible to participate in federal loan and grant programs from making certain misrepresentations to prospective students. 34 *C.F.R.* 668.71(b) states, in pertinent part,

> *An eligible institution is deemed to have engaged in substantial misrepresentation* when the institution itself, [or] one of its representatives, . . . *makes a substantial misrepresentation* regarding the eligible institution, including about the nature of its educational program, its financial charges, or *the employability of its graduates.*

[ (Emphasis added.) ]

34 *C.F.R.* § 668.72 defines misrepresentations as to the nature of the institution's program as including

> false, erroneous or misleading statements concerning . . . [w]hether successful completion of a course of instruction qualifies a student . . . *[t]o take the examination . . . required as a precondition for employment, . . . or to meet additional conditions that the institution knows or reasonably should know are generally needed to secure employment* in a recognized occupation for which the program is represented to prepare students.

[34 *C.F.R.* § 668.72(c)(2) (emphasis added).]

Misrepresentations regarding the employability of an eligible institution's graduates are also specifically addressed in 34 *C.F.R.* § 668.74, which prohibits "false, erroneous or misleading statements," including statements concerning the "institution's knowledge about the current or likely future conditions, compensation, or employment opportunities in the industry or occupation for which the students are being prepared[,]" 34 *C.F.R.* § 668.74(c), and "[o]ther requirements that are generally needed to be employed in the fields for which the training is provided[.]" 34 *C.F.R.* § 668.74(f).

The regulation of specific categories of prohibited misrepresentations clearly reflects an awareness that issues such as employability and what credentials are "generally needed" to be employed are important to the prospective student in selecting an institution

for post-secondary training.[10] The evidence here would permit a jury to conclude that information regarding employability upon completion of the Micro Tech DMUT program, the apparent necessity of ARDMS certification and the additional requirements before a Micro Tech graduate could be eligible to take the ARDMS certification were all facts to which "a reasonable person would attach importance" in selecting a school.

The affirmative misrepresentations alleged here also satisfy the criteria for materiality in subsection (b) of the *Restatement* definition. Plaintiff's unrefuted description of her interview with Brown provided ample basis for a jury to find that he knew her ability to be employed as an entry-level sonographer was a critical issue in her decision to enroll.

Both defendant and the trial court cited *Jacobsen, supra*, 53 *N.J.Super.* at 574, 148 *A.*2d 63, as support for the proposition that the statements made to plaintiff regarding her ability to work as an entry-level sonographer referred to defendant's own hopes and aspirations for its program rather than any actionable misrepresentation. Their reliance is misplaced.

In response to Columbia's suit to seek the balance of his tuition, Jacobsen filed a counterclaim, alleging fraud. *Id.* at 575–76, 148 *A.*2d 63. He cobbled together fifty mottos, inscriptions on buildings, quotations from brochures and the like, which, he alleged, falsely represented that Columbia would teach him wisdom, character and similar virtues and qualities. *Id.* at 576, 148 *A.*2d 63.

We agreed with the trial court that "wisdom is not a subject which can be taught and that no rational person would accept such a claim made by any man or institution." *Id.* at 579, 148 *A.*2d 63. We described the compendium of statements Jacobsen relied upon

---

[10] The use of deceptive recruiting practices by for-profit educational institutions has been the subject of an investigation by the Government Accountability Office, *see* U.S. Gov't Accountability Office, GAO–10–948T, *For–Profit Colleges* (2010), and a topic of public comment, *see* "Peter S. Goodman, *In Hard Times, Lured Into Trade School and Debt*," *N.Y. Times*, March 4, 2010, at A1.

as "nothing more than a fairly complete exposition of Columbia's objectives, desires and hopes[.]" *Ibid.* Because Jacobsen failed to establish an element of his claim, i.e., a false representation, we affirmed the trial court's order that granted summary judgment, dismissing the counterclaim.

Although Jacobsen's claim was based on fraud, we agree that Columbia's expression of lofty aspirational goals would also not be actionable under the CFA. Our recognition that "no rational person would accept" a claim that wisdom and character could be taught comports with the reasoning in cases that declined to find actionable statements that amounted to mere puffery. *See, e.g., Rodio v. Smith,* 123 *N.J.* 345, 352, 587 *A.*2d 621 (1991) (holding that insurer's slogan, "You're in good hands with Allstate" was not "a deception, false promise, misrepresentation, or any other unlawful practice" under the CFA but only "puffery"); *N.J. Citizen Action v. Schering–Plough Corp.,* 367 *N.J.Super.* 8, 13–14, 842 *A.*2d 174 (App.Div.) (finding that phrases in advertisements for allergy products such as "you ... can lead a normal nearly symptom-free life again" were not statements of fact but "merely expressions in the nature of puffery," not actionable under the CFA), *certif. denied,* 178 *N.J.* 249, 837 *A.*2d 1092 (2003). The difference between such expressions and statements that may be actionable under the CFA is that they did not thwart the reasonable expectations of the consumer and did not present information in a manner that deprived the consumer of material facts necessary to make an intelligent decision in selecting a product or service to purchase. *See Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 *N.J.* 392, 416, 655 *A.*2d 417 (1995), *cert. denied,* 516 *U.S.* 1066, 116 *S.Ct.* 752, 133 *L.Ed.*2d 700 (1996) (holding that to constitute consumer fraud, "the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer").

Plaintiff alleged that defendant made an affirmative misrepresentation in telling her that upon graduation, she would have the qualifications needed to obtain a job as a sonographer in hospitals

and clinics. She asserted that she was virtually unemployable as an entry-level sonographer because she could not, as a practical matter, attain eligibility for the ARDMS examination to obtain the certification required by employers. Her expert supported her version of the facts by explaining that major insurance companies would not reimburse a provider for any service performed by an ultrasound technician not certified by ARDMS. The inability to obtain reimbursement and the risk of sanctions provided ample reason for employers to decline to employ any ultrasound technologist who was not certified by ARDMS.

Defendant's president presented a contrary view, stating that an ARDMS certification was not required and that plaintiff was indeed employable as an entry-level sonographer.[11] This conflict required a determination of which was the more credible version, a matter which lies within the jury's exclusive role as the factfinder. *Rowe, supra,* 209 *N.J.* at 50, 34 *A.*3d 1248; *see also Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146; *Conrad, supra,* 394 *N.J.Super.* at 13, 925 *A.*2d 54. The motion judge therefore erred in weighing the two versions of the facts and finding the facts to be as stated by defendant, denying plaintiff the legitimate inferences to be drawn from the evidence she produced.

Further, although the judge found no issue of fact as to whether defendant intended to deceive plaintiff, plaintiff was not required to show such intent to support her claim of an affirmative misrepresentation in violation of the CFA. As we have noted, a person who makes an affirmative misrepresentation "is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." *Gennari, supra,* 148

---

[11] Although Mohsen denied that an ARDMS license was required for insurance reimbursement, he admitted he did not know what insurance company policy was with regard to reimbursement for sonograms. As for the need to have ARDMS certification to obtain employment, he testified, "As far as I know, if you want a job in ultrasound, working as a technician, you can get a job." He did admit that it was "[p]ossible in some cases" that a licensed person has an advantage in getting employment as opposed to someone who is not licensed.

*N.J.* at 605, 691 *A.*2d 350. To support her contention, plaintiff had to present evidence that defendant made a representation regarding a fact material to the transaction, that proved to be false, and was made to induce her to enroll in Micro Tech. *See Gennari, supra,* 288 *N.J.Super.* at 535, 672 *A.*2d 1190. If a jury accepted plaintiff's proofs, it could find the statement that plaintiff would be employable as an entry-level sonographer following completion of the Micro Tech DMUT program was a statement of fact, material to her decision to enroll and made to induce her to do so. The jury could also find, based upon the evidence, that this statement was false.

In light of the record and applicable legal principles, we are satisfied that the motion judge erred in granting summary judgment to defendant, dismissing plaintiff's CFA claim.

## VI

In its cross-appeal, defendant argues that the trial court erred in failing to afford it the benefit of the "learned professional" exception to the CFA. We disagree, and although the trial court rejected this argument on procedural grounds, we address its merits.

 That "judicially crafted rule" excludes certain transactions from the purview of the CFA "because they involve services provided by learned professionals in their professional capacity." *Lee v. First Union Nat'l Bank,* 199 *N.J.* 251, 263, 971 *A.*2d 1054 (2009). The reasoning for this exception is that such professionals are subject to regulation specifically applicable to their profession, which might conflict with the regulation of activities under the CFA. *Id.* at 264, 971 *A.*2d 1054; *Macedo v. Dello Russo,* 178 *N.J.* 340, 344–45, 840 *A.*2d 238 (2004); *see, e.g., Hampton Hosp. v. Bresan,* 288 *N.J.Super.* 372, 672 *A.*2d 725 (App.Div.), *certif. denied,* 144 *N.J.* 588, 677 *A.*2d 760 (1996). The fact that the activity is subject to regulation will not, alone, render the CFA inapplicable.

> In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied ... that a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes. It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes. We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility.

> [*Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 *N.J.* 255, 270, 696 *A.2d* 546 (1997).]

Plainly, there is no "patent and sharp" conflict when the "professional" is not subject to such regulation and therefore, the rationale for the exception no longer applies. In *Finderne Mgmt. Co., Inc. v. Barrett*, 402 *N.J.Super.* 546, 955 *A.2d* 940 (App.Div. 2008), we found the "learned professional" exception inapplicable to financial planners, observing that "no regulatory body defines uniform education, testing, or standards governing financial planners or the products they promote." *Id.* at 568–69, 955 *A.2d* 940 (citing *N.J.S.A.* 45:1–1 to –32 (Professions and Occupations Subject To State Boards Of Registration And Examination)). We found that, in the absence of governmental board or agency regulation, the fact that "competing voluntary associations issue designations to those who seek to be called 'financial planners,'" was insufficient to establish them as "learned professionals." *Id.* at 569, 955 *A.2d* 940. We therefore concluded, "the lack of uniform regulation of an occupational group defeats its recognition as 'learned professionals'" and exemption from the CFA. *Ibid.*

Defendant contends that it is entitled to the "learned professional" exception because it provides post-high school educational and vocational training. It has identified no regulatory body that defines uniform standards for the services it provides or its activities as a for-profit training school, let alone regulation that would present a "patent and sharp" conflict with the application of the CFA. Certainly, the federal regulations we have reviewed do not present such a conflict. Accordingly, the learned professional exemption is not applicable to defendant.

We are satisfied that any issues not specifically addressed lack sufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E). The order granting summary judgment, dismissing the common law fraud claim, is affirmed. The order granting summary judgment, dismissing the CFA claim, is reversed. As to the cross-appeal, we affirm the trial court's ruling that the "learned professional" exemption may not be relied upon by the defendant. We do not retain jurisdiction.