**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3719
_____

LEWIS WU; RACHEL WU,
                              Appellants

v.

CAPITAL ONE, N.A.; CHEVY CHASE BANK F.S.B.
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 12-cv-05000)
District Judge:  Honorable Faith S. Hochberg
_____

Argued:  April 22, 2015
_____

Before: CHAGARES, JORDAN and BARRY, <u>Circuit Judges</u>

(Opinion Filed: June 11, 2015)
_____

Matthew C. Capozzoli, Esq. (*Argued*)
Robinson, Brog, Leinwand, Greene, Genovese & Gluck
875 Third Avenue
9th Floor
New York, NY 10022
          *Counsel for Appellants*

Martin C. Bryce, Jr., Esq. (*Argued*)
S. Clifford Sacalis, Esq.
Ballard Spahr
1735 Market Street
51st Floor

Philadelphia, PA 19103
        *Counsel for Appellees*

_____

OPINION[*]

_____

BARRY, *Circuit Judge*

Lewis and Rachel Wu appeal from an order of the District Court granting summary judgment in favor of defendants Capital One, N.A. and Chevy Chase Bank F.S.B. ("the Bank") on appellants' tort and contract claims relating to a mortgage loan extended by the Bank.[1] We will affirm.

I.

In 2006, appellants took out a loan from the Bank in the amount of $5,795,418 to buy, and build a home on, property in Alpine, New Jersey. Of that amount, $2,495,418 was allocated for the purchase of the property. The remainder, $3.3 million, was to be disbursed periodically for construction once certain "acceptance conditions" were satisfied, among them the Bank's acceptance of a construction contract and contractor and an appraisal "showing an 'as-completed' value equal to or exceeding" the amount of the loan. (App. 243a.) Additionally, the loan could not be in default. Whether these

_____

[*]  This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] It is undisputed that Capital One succeeded to the interests of Chevy Chase when it acquired the latter in 2009. Additionally, although Rachel Wu did not sign certain of the loan documents, appellants' position is that she became a party to the loan by executing other documents. As our disposition makes the issue irrelevant, we use the term "appellants" regardless of whether the actor was Lewis or Rachel Wu, or both.

2

conditions were met was within the Bank's "sole discretion." (*Id.*)

Although these and the other requisites for appellants to proceed from the first (or "acquisition") phase of the loan to the second (or "construction") phase were to be satisfied by, at the latest, 180 days from the March 1, 2006 closing, and construction was to be completed within 12 months after that, appellants did not submit a proposed construction contract until August 30, 2007—nearly 18 months after the closing. The proposed contract provided an 18-to-24-month time frame for construction, and an estimated construction cost of approximately $4.5 million—$1.2 million more than what the loan budgeted for construction. Despite these and other deficiencies in the proposed contract, the Bank proceeded to obtain two appraisals for the project. It accepted the lower of the two, which estimated the project's "as completed" value at $7.45 million. This figure resulted in a loan-to-value ("LTV") ratio of 77.8%.

After receiving the appraisals, the Bank informed appellants that for it to proceed with the project, they would have to verify assets in the amount of $3,873,525. Appellants failed to do so, and on October 9, 2007, the Bank informed them that the loan had "expired" on October 1, and that their mortgage payment would not be applied until an extension was processed. An agreement extending the construction deadline by a year was subsequently executed.

The extra year proved futile, however, as appellants did not build the house. On October 9, 2008, the Bank informed them that the loan was in default "because the construction term . . . [had] matured and [had] not converted to permanent financing or

3

been paid in full." (App 528a.) The Bank originally demanded full repayment within 30 days, but ultimately allowed appellants another, more limited, extension until October 1, 2009. This time, however, the extension was limited to repayment of the loan; the Bank refused to fund the construction.

Appellants' loan was secured by a mortgage on the Alpine property and their residence in Norwood, New Jersey. The mortgage stated that it secured the repayment of the loan and the performance of appellants' "covenants and agreements" under both the mortgage and the note evidencing the loan. (App. 264a.) Additionally, a "Cross-Collateralization Rider" provided that the properties would be treated "as a single property" for purposes of collateral for the note. (App. 290a.) A separate "Deed of Trust Rider" provided that if appellants reduced the outstanding principal balance to $4,740,892 within 90 days of the loan entering the permanent phase, the Bank would release the lien on the Norwood property. The parties agree that the amount of the reduction reflected the value of the Norwood property at the time of the loan closing.

In negotiating the second extension with the Bank—after failing to convince it to fund construction if he "downsized" to the original $3.3 million figure—Lewis Wu requested it release the lien on the Norwood property. He asserted that that lien was only intended to secure the construction portion of the loan, which by that point would not be disbursed. The Bank declined, countering that the Norwood property was encumbered in lieu of its requiring an approximately $1 million additional cash down payment at closing, and until that amount was paid, the property would not be released. Wu did

4

convince it to waive its prepayment penalty if he made timely payments and paid off the loan by October 1, 2009.

Appellants stopped making payments on the loan in late 2009, and in April 2011, the Bank filed a foreclosure action in state court. On May 16, 2012, summary judgment was entered in the Bank's favor.[2] On August 8, 2012, appellants filed this action, asserting claims for breach of contract, fraud, and credit slander, and seeking reformation of the mortgage. The District Court granted the Bank's motion for summary judgment. This appeal followed.

## II.[3]

Appellants argue that their contract claims should have survived summary judgment because the Bank exercised the discretion granted to it under the loan documents in bad faith. They also assert that their fraud claim relies on statements of fact, not law, and that their fraud and credit slander claims were not preempted by the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x ("FCRA"). We reject the first two arguments, and decline to reach the third.

---

[2] Upon the Bank's motion, the state court subsequently vacated its judgment in the foreclosure case on the ground that Rachel Wu was not served. As explained at oral argument, the details and status of that matter are not relevant to the issues before us.

[3] The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291. Our review of a grant of summary judgment is plenary. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

A.

A breach of contract claim requires proof that the defendant failed to perform as required under the contract. *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007). Here, appellants supplied no evidence of a breach by the Bank, rendering summary judgment in its favor appropriate. *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 666 (3d Cir. 2002) (if non-movant fails to establish essential element of claim on which it bears the burden of proof, "there is no issue as to a genuine issue of a material fact and thus the moving party is entitled to judgment as a matter of law"). Each of the challenged positions the Bank took – its $10 million appraisal requirement, $3.8 million asset verification demand, refusal to fund construction, and refusal to release the Norwood lien – finds support in the loan documents.

First, as a condition to funding construction, the loan documents allowed the Bank to require an appraisal indicating a project value "equal to or exceeding" the loan amount; the decision of whether that condition was satisfied was in its "sole discretion." (App. 243a; *see also* App. 225a.) In requiring a $10 million appraisal, the Bank used a figure representing an as-completed value that would keep the LTV ratio below 60% given the $5,795,418 loan amount; the loan documents expressly permit the Bank to hold appellants to a maximum LTV ratio for their specific loan product.[4]

When the appraisal fell short and the construction estimate ran over, the Bank

---

[4] Indeed, appellants cannot claim ignorance of the 60% figure, as the Bank used it in initial calculations regarding the loan amount—even before appellants increased the loan commitment by approximately $1 million by mortgaging their Norwood residence—and Lewis Wu expressly conceded he was aware of it.

could, under the terms of the loan documents, require that appellants fund the difference. The requested asset verification reflected the increased construction costs plus the amount needed to reduce the LTV ratio to 60% in view of the appraisal. Yet appellants refused to verify additional assets, despite testifying later that they could have done so. Given this sequence of events, the Bank's decision not to fund construction—essentially, its decision that the "acceptance conditions" had not been met—is both unsurprising and within its contractual rights.

With respect to the Norwood property, appellants argue it was intended only to serve as security for a "short-term advance" above a "final" loan figure of approximately $4.7 million. (Opening Br. 5.) However, the mortgage is clear that the Norwood property is collateral for the entire loan, and it provides no "out" if, as appellants suggest is the case, the loan is over-collateralized. The Deed of Trust Rider provides for the release of the Norwood property if appellants were to reduce the outstanding principal to $4.7 million within 90 days of conversion to the permanent phase, but is silent on what happens if the permanent phase is never reached, or if the loan proceeds are not fully disbursed. In view of the clear terms of the mortgage, the mere existence of the Deed of Trust Rider does not warrant looking to extrinsic evidence of purported intent. The cross-collateralization rider buttresses our conclusion and expresses the *opposite* intent from that advocated by appellants: it provides that the two properties are to be treated as one property for purposes of securing the loan.

Appellants' primary argument on appeal is that the Bank breached its obligation to

7

exercise its discretionary authority in good faith. In other words, they contend that the Bank violated the implied covenant of good faith and fair dealing. There is, however, insufficient evidence in the summary judgment record to raise a genuine dispute of fact on this point, and, therefore, although, as we note *infra*, we disagree with the District Court's statement of New Jersey law on the implied covenant, we reach the same result: summary judgment for the Bank was proper.

The implied covenant of good faith and fair dealing requires that parties to a contract not "'do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Sons of Thunder v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997) (citation omitted). Thus, parties must perform their contractual obligations in good faith and so as not to destroy the reasonable expectations of opposing parties. *See Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001).

With respect to discretionary provisions of a contract, the covenant prohibits the exercise of a party's discretion "arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." *Id.*[5] It does not, however, vitiate a party's "contractual right to exercise discretion . . . based on its own reasonable beliefs concerning business strategy," so long as a "bad motive" does not animate the decision. *See id.* ("Without bad motive or

---

[5] We disagree with the District Court's statement that "the covenant of good faith and fair dealing cannot prohibit [the Bank] from exercising discretion expressly permitted by the agreement." (App. 13a.) To the contrary, the covenant *circumscribes* the exercise of that discretion. *See Wilson*, 773 A.2d at 1130. The Court's error is harmless, however, because, as discussed *infra*, appellants made an insufficient showing of bad faith to survive summary judgment.

8

intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance."); *see also Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005) (proof of bad motive is "vital" to claim for breach of the covenant).

We cannot conclude, on this record, that the Bank acted "arbitrarily, unreasonably, or capriciously" in exercising its discretion when it declined to fund construction after appellants provided construction plans behind schedule and over budget, the project was appraised below expectations, and—when given an opportunity to proceed regardless of these deficiencies by verifying assets sufficient to meet the Bank's requirements—appellants failed to do so. The appraisal requirement reflected an LTV ratio known to appellants all along and that remained consistent throughout the parties' relationship. This same figure remained central when the Bank calculated the requested asset verification figure after appellants increased their proposed construction costs and after substantial delays arose in the timeline set out in the loan documents. This series of events bespeaks not bad faith or bad motives on the Bank's part, but rather business decisions within the scope of the risk assumed by appellants when they obtained the loan. *See Wilson*, 773 A.2d at 1127.

Appellants' primary "evidence" of bad faith, as we have noted, is that the loan documents do not support the funding requirements the Bank imposed. Our conclusion that the Bank did not breach any of the loan documents forecloses that argument. Appellants' other support for their bad faith argument is equally weak. They speculate

9

that the Bank's financial difficulties demonstrate that its true motivation was to avoid its obligations under the loan, and that its funding requirements were a pretext to accomplish this end. Even if we assume, as appellants suggest, that the Bank was in financial straits, they have not pointed to any evidence indicating that this influenced the Bank's decisions with respect to them. Appellants also suggest that the Bank chose an asset verification figure it knew they could not meet. Again, however, they point to nothing in the record supporting any such thing. What *is* in the record is Lewis Wu's statement in his deposition that he could verify sufficient assets for the Bank, but chose not to.[6] This statement undermines appellants' argument that they were "financial[ly] vulnerab[le]" and subject to the Bank's "self-serving use of [its] clearly unequal bargaining power" in view of its security interests in both the Norwood and Alpine properties. (Opening Br. 20.) In short, summary judgment was properly granted to the Bank on plaintiffs' bad faith claim.

B.

With reference to appellants' fraud and credit slander claims, the District Court concluded that the Bank's representations appellants challenged were statements of law that could not support a fraud claim. The Court also concluded that the fraud claim failed because appellants' damages flowed from the Bank's purported false credit reporting and

---

[6] When asked about the increased costs under the proposed construction contract, Wu replied that he had "over $4 million in personal assets. What's a million dollars?" (App. 190a.) He later agreed that he had more than $3.8 million available to him, and that it would have been a matter of verifying it. (App. 194a.) "But," he countered, "where in the original loan conditions does it state that I would need to do a second verification?" (*Id.*)

it was therefore preempted by FCRA. As best we can tell, the Court applied the same logic to appellants' credit slander claim.

On appeal, the parties have spent much effort on what we acknowledge is a difficult preemption question. We need not reach the issue, however, because even if the claims were not preempted, they fail on the merits.

Indeed, appellants' fraud claim fails on the first element. In New Jersey, fraud claims require a "material misrepresentation of a presently existing or past fact." *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997). Appellants have pointed to the $10 million appraisal requirement, the asset verification demand, and the Bank's October 2008 statement that they were in default as false statements of fact. It is unclear how the Bank's assertion of the circumstances under which it would consider the acceptance conditions met—in other words, when it would consider the contractual prerequisites to its own performance satisfied—is a statement of "presently existing or past fact," as opposed to a statement of opinion that cannot support a fraud claim. *See Suarez v. E. Int'l Coll.*, 50 A.3d 75, 86 (N.J. Super. Ct. App. Div. 2012); *Daibo v. Kirsch*, 720 A.2d 994, 999 (N.J. Super. Ct. App. Div. 1998). Even assuming appellants are correct, however, we cannot see how these statements were false. As we have explained, the Bank's appraisal and asset verification demands were grounded in the language of the loan documents. Moreover, appellants point to nothing demonstrating that they were *not* in default of the loan or the extension agreement in October 2008; among other things, they never built the house. Summary judgment was, therefore, properly granted for the Bank on

11

appellants' fraud claim.

The claim for credit slander, a type of defamation, also requires proof of false statements of fact. *See Biederman v. Mitsubishi Motors Credit of Am.*, 753 A.2d 1251, 1256 (N.J. Super. Ct. Law Div. 2000); *see also FDIC v. Bathgate*, 27 F.3d 850, 871 (3d Cir. 1994) (applying New Jersey law). Appellants claim that the Bank reported to credit reporting agencies and others that they were in default, but they fail to demonstrate how this alleged statement was false. As we have discussed, the record is clear that appellants failed to comply with their contractual obligations, and they concede they stopped paying the loan in 2009. Summary judgment was properly granted.

Finally, aside from a passing reference in a footnote, plaintiffs have not pressed their reformation claim on appeal. That claim, then, has been waived. *United States v. Hoffecker*, 530 F.3d 137, 162 (3d Cir. 2008) (a "one-sentence footnote" was insufficient to avoid waiver). In any event, appellants provided no evidence of mutual mistake with respect to the loan documents' treatment of the Norwood property, and any alleged mistake on their part was unaccompanied by evidence of fraud or inequitable conduct by the Bank. *See St. Pius X House of Retreats v. Diocese of Camden*, 443 A.2d 1052, 1055 (N.J. 1982) ("The traditional grounds justifying reformation of an instrument are either mutual mistake or unilateral mistake by one party and fraud or unconscionable conduct by the other.").

### III.

We will affirm the order of the District Court.